UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

KALI WATKINS,

                                   Plaintiff,

          -vs-

TOWN OF WEBSTER, WEBSTER POLICE
DEPARTMENT, JOSEPH RIEGER, ALEX
KIRKPATRICK, GRETCHEN O'DEA, JEFFREY
WEBSTER, WEBSTER CENTRAL SCHOOL
DISTRICT, CARMEN GUMINA, PAUL BENZ,
JACQUELINE GOODWINE, STEPHANIE
REUSCH, STACEY EXNER, JOHN DOE(S) and
JANE DOE(S),

                                   Defendants.

---

Civil Action No.:
6:21-cv-06233-EAW

**COMPLAINT
AND JURY DEMAND**

           Plaintiff, Kali Watkins, for his Complaint against the above-captioned defendants,

respectfully alleges, upon information and belief, as follows:

## INTRODUCTION

           1.       This lawsuit arises out of a biased, malicious, willfully reckless, and egregiously

negligent investigation that led to the public humiliation, arrest, and trial of a decorated and

respected black male high school basketball coach falsely accused **(and exonerated)** of the

horrific crime of raping a child.

           2.       From its inception, the "investigation" that dragged Kali Watkins through the

mud was biased and tainted with animus. It was spearheaded by a conflicted police

department: the *police chief* and his own *daughter* were both material fact witnesses who

disliked the fiery basketball coach.

           3.       Additionally, the "investigation" was influenced and corrupted by a school

district whose own *superintendent* had a malicious personal vendetta against Watkins. This vendetta stemmed from the superintendent's discovery that his extra-marital partner (a teacher hired by the superintendent) was also having an intimate relationship with Watkins.

4.      For his part, Watkins never hid from the police. He provided anything and everything the police department asked for, including all of his cell phones, laptops, and computers. The police department had all of his emails, text messages, call histories, and detailed location data. Instead of using this massive trove of timestamped data to pinpoint Watkins's whereabouts during the timeframe alleged, or to corroborate the accusations, the police department pried into the salacious details of his consensual sex life.

5.      The accuser stated that the crime allegedly occurred on a school day around 3:00 pm in the girls locker room before a home game in the 2016-2017 basketball season. The police department did not attempt to locate and interview a single witness who could have provided information about the time, place, and manner of the occurrence. Other than the police chief's *own daughter*, they did not interview a single one of the accuser's teammates who spent every game day with Watkins and the accuser. They did not conduct a meaningful interview of the police chief himself, even though he gave rides to the accuser after game days. They did not interview the coaches who spent every game day with Watkins. They did not interview faculty members who would have been around during the alleged timeframe. They did not interview any of the female physical education teachers who would have had access to the scene of the alleged crime.

6.      Instead, the police were consumed with Watkins's consensual and totally legal sexual relationships with faculty members and focused the investigation there. These faculty members told salacious tales and unverified lies to police out of spite. The police department

used this information and concluded it was enough.

7. Critically, the superintendent himself was having an extramarital affair with a faculty member that Watkins was also dating. Instead of recusing himself due to a clear personal conflict, the superintendent used the full force of his position and initiated a separate frivolous investigation against Watkins. He had Watkins followed and ultimately fired. It was during this time that the rape allegations surfaced.

8. Instead of protecting Watkins's due process rights, the superintendent made up his mind and very publicly questioned the innocence of Watkins in front of faculty members. He held an "emergency" meeting informing faculty members to cut off contact with Watkins. He sent school officials to bully faculty members into silence.

9. Without any corroborating evidence and no attempt to verify any of the claims made by the accuser, Watkins was arrested and charged with a horrible unthinkable crime.

10. If the police department and school district did not willfully ignore the exculpatory evidence or obstruct the investigation, there would have been no probable cause to arrest and charge Watkins. Instead, an innocent black man was forced to hire a criminal defense attorney and incur thousands of dollars in legal fees to reconstruct a timeline from the same evidence the police department already had in its possession but willfully ignored. Had the police department performed its duties and the school district protected his due process rights, they would have discovered that it was impossible for the alleged crime to have occurred in the time, place, and manner alleged.

11. This was an injustice. An innocent man subjected to public humiliation and financial ruin all because of personal animosity and a reckless and malicious investigation. This lawsuit is a step towards justice.

## THE PARTIES

12.     Plaintiff Kali Watkins ("Plaintiff") is a resident of the State of New York, Monroe County.

13.     Defendant Town of Webster (the "Town") is a duly organized town located in Monroe County, New York.

14.     The Town maintains the Defendant Webster Police Department ("WPD"), a police department duly authorized under the New York State law, which acts under the supervision and direction of the Town.

15.     At all times alleged herein, Defendant Joseph Rieger ("Chief Rieger") was the duly sworn chief of police employed with the WPD, who violated Plaintiff's rights as described herein.

16.     At all times alleged herein, Defendants Alex Kirkpatrick ("Investigator Kirkpatrick"), Gretchen O'Dea ("Investigator O'Dea"), and Jeffrey Webster ("Sgt. Webster") were duly sworn police officers employed with the WPD, who violated Plaintiff's rights as described herein.

17.     At all times alleged herein, Chief Rieger, Investigator Kirkpatrick, Investigator O'Dea, and Sgt. Webster (collectively, "WPD Defendants") were duly sworn police officers of WPD and were acting under the supervision of said department and according to their official duties.

18.     Defendant Webster Central School District (the "School District") is a municipal corporation organized and existing by virtue of the laws of the State of New York.

19.     At all times alleged herein, Defendant Carmen Gumina ("Superintendent Gumina") was the superintendent employed by the School District, who violated Plaintiff's

rights as described herein.

20.    At all times alleged herein, Defendant Paul Benz ("Principal Benz") was the principal of Webster Schroeder High School employed by the School District, who violated Plaintiff's rights as described herein.

21.    At all times alleged herein, Defendant Jacqueline Goodwine ("Assistant Principal Goodwine") was the assistant principal of Webster Schroeder High School employed by the School District, who violated Plaintiff's rights as described herein.

22.    At all times alleged herein, Defendants Stephanie Reusch ("Reusch") and Stacey Exner ("Ms. Exner") were school psychologists at Webster Schroeder High School employed by the School District, who violated Plaintiff's rights as described herein.

23.    At all times alleged herein, Defendant Stacey Exner ("Exner") was a school psychologist at Webster Schroeder High School employed by the School District, who violated Plaintiff's rights as described herein.

24.    At all times alleged herein, Superintendent Gumina, Principal Benz, Assistant Principal Goodwine, Reusch, and Exner (collectively, "School District Defendants") were employees of the School District and were acting under the supervision of the School District and according to their official duties.

25.    All John and Jane Does are presently unnamed individual employees and/or agents of the School District and WPD and are included within the "WPD Defendants" and "School District Defendants."

26.    The individual defendants are sued in their individual and official capacities.

## JURISDICTION AND VENUE

27.    Plaintiff concedes that this Court has removal jurisdiction over this case.

28.     This Court has original jurisdiction under 28 U.S.C. § 1331 based upon Federal Question because one or more of the claims asserted in this case are brought under 42 U.S.C. § 1983.

29.     This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1336 because all claims are related to and form part of the same case and controversy.

30.     Venue is proper in the Western District of New York under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to this proceeding occurred in this district. Namely, Plaintiff was prosecuted and acquitted for actions alleged to have occurred in Monroe County, New York. The parties also are residents of and/or maintain offices in Monroe County, New York.

## CONDITIONS PRECEDENT

31.     Prior to commencing this action, Plaintiff complied with § 50-e of the General Municipal Law in that a written verified Notice of Claim upon which this action is founded was presented to Defendants on or about November 20, 2019, which date was within three months after the accrual of this claim.

32.     More than thirty days have elapsed since the service of such notice and adjustment or payment thereof has been neglected or refused.

33.     This action has been commenced within one (1) year and ninety (90) days after the within cause of action arose.

34.     All conditions and requirements precedent to the commencement of this action have been complied with.

35.     The oral examination of Plaintiff has been conducted in compliance with

Section 50-H of the General Municipal law.

36.     Pursuant to CPLR § 1602(2)(iv), Defendants are jointly and severally liable for all of Plaintiff's damages, including but not limited to Watkins's non-economic loss.

## FACTUAL ALLEGATIONS

### A.     Plaintiff's Accomplishments

37.     Plaintiff was a well-respected special education teacher and coach in the Rochester, New York area.

38.     In his fourteen-year career as a coach and special education teacher, Plaintiff never had any incident requiring any disciplinary action.

39.     From 2004 to 2015, Plaintiff worked as a special education teacher in the City of Rochester. In 2015, Plaintiff was hired to teach ninth grade special education at Webster Schroeder High School ("WSHS").

40.     Additionally, Plaintiff coached the WSHS varsity boys football team from 2006 until 2017 and the WSHS junior varsity girls basketball team from 2008 until 2017.

41.     Plaintiff was the only black teacher in the School District.

42.     The population of Webster, New York is 91.9% white and 2% black, according to the 2019 census,[1] and the local police department (WPD) has no black police officers.

43.     Despite the challenges of being a black man in this environment, Plaintiff rose to prominence at WSHS.

44.     In addition to being a well-respected and well-liked teacher, Plaintiff coached his football players to three Monroe County division titles.

45.     In November 2017, Plaintiff was named the Monroe County Division I

---

[1] https://www.census.gov/quickfacts/webstertownmonroecountynewyork

Football Coach of the Year for the second time during his tenure at WSHS. He was also set to be named the new varsity girls basketball coach.

46.    It was during this time—at the peak of his accomplishments as an influential and well-liked black man in Webster, New York—that Plaintiff fell victim to a orchestrated effort to take him down.

**B.    The Animus of Superintendent Gumina**

47.    During his time at WSHS, Plaintiff had some shocking encounters with Superintendent Gumina.

48.    In Spring 2017, at a school event about racism, Superintendent Gumina told Plaintiff that white privilege does not exist and "things are not like that in Webster." Plaintiff was disturbed by these comments. Here was the top executive in the School District who hires, supervises, and manages staff, belittling the black experience directly to the face of his only black teacher—at a school event about racism.

49.    Around this time, Superintendent Gumina aggressively pushed Plaintiff to implement a summer football camp run by University of Rochester, which charged $400 per player. Plaintiff voiced his objection, stating that he would feel uncomfortable asking players for money when the WSHS coaching staff already ran a summer football camp voluntarily. Even though Plaintiff was the 3-time division champion football coach who knew what was best for his players, Superintendent Gumina was angered by Plaintiff's objection because there was a lot of money to be made with the partnership.

50.    On another occasion, Superintendent Gumina essentially threatened one of Plaintiff's football players who was dating Superintendent Gumina's daughter. He directed Plaintiff to confront the player on his behalf and explain to him the "political realities" of

"displeasing the superintendent." Plaintiff refused, but it was clear that Superintendent Gumina had no problem making threats and abusing his authority as superintendent of the School District.

51.     At least as early as 2017, Superintendent Gumina was having an extramarital affair with a female faculty member of the School District.

52.     Superintendent Gumina created her teaching position in 2016.

53.     At some point in 2017, Superintendent Gumina discovered that she was also having an intimate physical relationship with Plaintiff.

54.     Upon information and belief, the discovery caused Superintendent Gumina to become jealous and angry at Plaintiff.

**C.     The School District Investigation**

55.     In November 2017, Plaintiff was directed to appear for a meeting at the School District office.

56.     Present at the meeting were: Superintendent Gumina, the School District's attorney, David Swinson (Human Resources), and two Webster Teachers Association representatives.

57.     The School District's attorney informed Plaintiff that they suspected he was having an inappropriate relationship with a student and "grooming" her. Plaintiff laughed out loud at the suggestion.

58.     Amongst other things, Plaintiff told them the student was "like my daughter", that he knew the girl's parents, that the parents knew he attended her softball games to support her, and that he gave her free t-shirts from sponsors. He explained that he regularly gave away the piles of free apparel from sponsors to students, custodians, secretaries, and even

Superintendent Gumina himself.

59.     When Plaintiff stated that he treats the girl the same way he treats his male students, the attorney, incredibly, responded that the School District would hypothetically investigate such allegations involving a male student "if you were gay."

60.     At the close of the meeting, Plaintiff was informed that the School District would continue its investigation. Plaintiff welcomed the investigation and told them they could talk to anyone.

61.     Despite the obvious conflict of interest and animus towards Plaintiff arising from the extra-marital affair, Superintendent Gumina authorized, planned, and directed the investigation on behalf of the School District.

62.     A few days later, at a meeting on or about November 17, 2017, Plaintiff was informed that he was being placed on administrative leave and that he had an "opportunity to resign" while the School District continued to investigate.

63.     Superintendent Gumina told Plaintiff that "gifts are not right" (despite the fact that they were free t-shirts given to everyone) and also referred to Plaintiff's "pattern" of consensual relationships with female faculty members.

64.     During his time at WSHS, Plaintiff did have legal, consensual, non-exclusive relationships with female faculty members *like many others at WSHS (including Gumina himself)*. Plaintiff freely admitted this and provided examples of other faculty members doing the exact same thing. In response, Superintendent Gumina simply stated, "I don't know anything about it."

65.     During this time, the School District, by and through Superintendent Gumina, Principal Benz, Assistant Principal Goodwine, and other employees and agents, hired a

private investigator who followed and spied on Plaintiff.

66.     Upon information and belief, Superintendent Gumina abused his power as superintendent and used the surveillance as an excuse to find out if his extra-marital partner was still involved with Plaintiff.

67.     The surveillance uncovered nothing suspicious.

68.     The "grooming" allegations did not come from the student. In fact, she and her mother denied there was an inappropriate relationship.

69.     The allegations were orchestrated by Exner and Reusch, who were both school psychologists and close personal friends.

70.     At the time, Exner had a falling out with Plaintiff after an intimate personal relationship with him.

71.     During the course of their intimate relationship, Exner learned that Plaintiff was nothing more than a source of moral support for the student who was dealing with her parents' divorce.

72.     Exner never reported any of these interactions to the School District, nor did she confront the student about them, because the relationship was totally appropriate.

73.     It was only after Plaintiff terminated his intimate relationship with Exner, that she and Reusch conspired to get Plaintiff in trouble.

74.     Exner and Reusch met with the student and asked if Plaintiff was "grooming" her.

75.     Exner and Reusch made this inquiry despite knowing full well that Plaintiff was merely a source of moral support for the student, and that he routinely distributed free apparel to students and faculty, alike.

76.     When asked, the student did not even know the meaning of the word "grooming" and they had to show her the dictionary definition. The student denied there was any inappropriate conduct.

77.     Despite all of this, the School District made the student the focus of a bizarre investigation motivated by personal and racial animus towards Plaintiff. As a result of the investigation, the student stopped attending classes and Plaintiff endured a character assassination.

78.     What followed was a willfully negligent, reckless and *public* investigation that ignored Plaintiff's privacy, trampled on his due process rights, and created a circus-like atmosphere at WSHS.

79.     On November 17, 2017, the same date that Plaintiff was placed on administrative leave and before the investigation was even concluded, Superintendent Gumina boldly announced to a faculty member (who had no business knowing in the first place) that he had no intention of bringing Plaintiff back.

80.     The willfully negligent and reckless investigation resulted in leaks, rumors, and unfounded sexual innuendo permeating the halls and classrooms of WSHS.

81.     Faculty members had very specific details about the supposedly private investigation. Additionally, students and faculty members propagated false rumors and baselessly speculated that Plaintiff had inappropriate relationships with the student and others.

82.     Faculty members used the investigation to air their own personal grievances about their consensual intimate relationships with Plaintiff and smeared his name in the process.

83.     Thus, the investigation expanded beyond the frivolous allegations of "grooming" and became a fishing expedition into the perfectly legal and consensual sex life of Plaintiff. All the while, faculty members *and the superintendent himself* freely engaged in the same conduct without punishment.

84.     None of the female faculty members who confessed to having non-exclusive intimate relationships with Plaintiff were punished or reprimanded. No one else who gave away free apparel to students was punished or reprimanded. No one else who had supportive appropriate relationships with students was punished or reprimanded.

85.     However, on or about November 21, 2017, Superintendent Gumina stated in a letter that he intended to terminate Plaintiff's position at a board meeting on December 27, 2017.

86.     Upon information and belief, Plaintiff was terminated at that board meeting.

**D.     The WPD Investigation**

87.     It is against the backdrop of this circus-like atmosphere created by the School District Defendants, fueled by rumors and disgraceful sexual innuendo, that a player on the junior varsity girls basketball team was emboldened to falsely accuse Plaintiff of the appalling crime of rape (hereafter, the player shall be referred to as the "Accuser").

88.     Plaintiff was the head coach of the basketball team. His own daughter was a member of the same basketball team, and he treated all of his players like they were his own daughters. These serious allegations absolutely blindsided Plaintiff, his family, and his players.

89.     The Accuser made the allegations at a sleepover with her friend, where, upon information and belief, they were under the influence of drugs and/or alcohol. At the

sleepover, the Accuser told her friend that, one year prior, Plaintiff told her to report early for a basketball game and then committed the act in the girls locker room before the game.

90.    The Accuser did not report the allegations directly to the WPD or the School District. Rather, the Accuser's friend told Reusch about the allegations.

91.    Reusch did not immediately contact law enforcement or speak with the Accuser privately in a non-threatening environment.

92.    Instead, on December 15, 2017, Reusch confronted the Accuser in a pressure-packed room full of school administrators and her own father. This was not a serious fact-finding endeavor, and the fifteen-year-old girl had little choice but to acknowledge the allegations in the presence of so many adults.

93.    That same day, the WPD initiated an investigation, which was directed by Chief Rieger and carried out by Investigator O'Dea, Investigator Kirkpatrick, Sgt. Webster, and other agents and/or employees of WPD.

94.    At its inception, the WPD should have recused itself not only because this was a highly charged case in a tightknit community directly affecting family members of the police force, but also because Chief Rieger and his own daughter were extremely biased material fact witnesses in the case.

95.    Chief Rieger's daughter was a teammate and close personal friend of the Accuser. Chief Rieger regularly attended the basketball games and routinely drove the Accuser home from the games. Both parties were uniquely situated to provide highly relevant information concerning the timeline of a rape that allegedly occurred one-year prior.

96.    Upon information and belief, Chief Rieger and Superintendent Gumina have a very close personal relationship.

97.    Additionally, Plaintiff's fiery coaching style was not well received by some of the players and parents. Upon information and belief, this was largely due to the fact that he was a black male coaching a team of mostly white girls in a town with little diversity.

98.    Chief Rieger and his daughter were among the parents and teammates who intensely disliked Plaintiff.

99.    Accordingly, *both* the police chief who oversaw the investigation *and* his own daughter were material witnesses in a life-altering rape investigation against a man they both despised. Further, upon information and belief, the WPD Defendants either shared this animus, or at minimum, were heavily influenced by it.

100.   Instead of recusing themselves from the investigation and/or referring it to another entity, Chief Rieger and the WPD Defendants persisted in conducting a biased, willfully reckless, and grossly negligent investigation tainted by personal and racial animus against the suspect.

101.   The Accuser was unable to point to a specific date of the alleged incident.

102.   However, very early in the investigation, she told the WPD Defendants that the act allegedly occurred:

      (i)     In the WSHS girls locker room;

      (ii)    On a bench;

      (iii)   Before a home game;

      (iv)   On a school day;

      (v)    Either right before or right after Christmas break 2016-2017;

      (vi)   When there was snow on the ground;

      (vii)  When Accuser was benched for the entire game;

(viii)   When Accuser's father did not attend the game (one of the few times);

(ix)   When Accuser's mother was late to pick her up from the game and Accuser was angry at her; and

(x)   On a game day when Accuser did not attend school the day prior.

103.   Despite all of these fact-specific data points served on a platter, the WPD Defendants willfully, recklessly, and negligently made no effort to investigate the case to confirm the date of occurrence or the legitimacy of the Accuser's allegations.

104.   The WPD Defendants made no effort to locate or interview witnesses who may have had critical knowledge about the time, place and manner of the alleged occurrence.

105.   For example, the WPD interviewed just <u>one</u> player on the junior varsity girls basketball team – and it was *over one year* after the investigation started. This one player was <u>Chief Rieger's</u> *own daughter*, who was also a close friend of the Accuser. In an interview on January 1, 2019, Investigator O'Dea and Investigator Kirkpatrick made no serious attempt to inquire about the factual circumstances of the serious life-altering rape allegations. They did not ask about the car rides with the Accuser, or the behavior and routine of this close personal friend and teammate. Instead, the report focused on the daughter's intense dislike for Plaintiff, his aggressive coaching style, and unfounded rumors circulating about him. Similarly, in Chief Rieger's statements to WPD on March 2, 2018, he focused on a single incident when Plaintiff allegedly became angry during a game.

106.   No other players were questioned by the WPD Defendants. This despite the fact that these girls spent every single game day with Plaintiff and the Accuser. These girls would have been in the best position to provide detailed facts concerning the alleged timeframe, the daily routine of players on game days, the behavior of the Accuser and Plaintiff, and use and access to the locker room.

16

107.    The WPD Defendants even failed to question Plaintiff's *own daughter*, a member of the team who routinely arrived at games together *with Plaintiff*. She was in the best position to provide detailed information about Plaintiff's whereabouts on the game days during the alleged timeframe.

108.    Additionally, the WPD Defendants failed to interview any of the assistant coaches about the factual circumstances of the serious life-altering rape allegations despite the fact that these coaches had access to the girls' locker room and spent every single game day with Plaintiff and the Accuser. These coaches would have been in the best position to provide detailed facts concerning the alleged timeframe, the daily routine of players on game days, the behavior of the Accuser and Plaintiff, and use and access to the locker room.

109.    Additionally, the WPD Defendants failed to interview Meredith Ermstrom, the girls' physical education teacher whose office window looked directly out into the scene of the alleged crime. This basic failure is inexcusable, as Ermstrom would have been in the best position to provide detailed facts concerning her observations of the use and access to the locker room during the alleged timeframe.

110.    In fact, the WPD Defendants failed to interview anyone at the School District concerning the factual circumstances of the alleged occurrence who could have been present in the general vicinity of the girls' locker room and gym or who otherwise interacted with Plaintiff and the Accuser during the alleged timeframe—including janitors, security personnel, teachers, and other faculty members. For example, the Accuser states while she was walking down the hall in school, Plaintiff told her to show up early to the locker room. The WPD Defendants made no effort to locate any witnesses to corroborate this statement.

111.    The WPD Defendants also failed to use any of the information gleaned from

Plaintiff's or Accuser's electronic devices to locate exculpatory witnesses, narrow the alleged timeframe, or confirm the Accuser's allegations.

112.    Additionally, the WPD Defendants failed to adequately examine or take measurements of the bench where the act allegedly occurred. Had they performed this basic investigative task, they would have observed that it was physically impossible for the act to have occurred as alleged given the weight and dimensions of the bench.

113.    Additionally, the WPD Defendants failed to use any of the information *provided by Plaintiff* to confirm the time, place, and manner of the alleged occurrence.

114.    Over the course of numerous interviews with the WPD Defendants, Watkins had nothing to hide. He answered all questions, consented to the search of his property, and turned over every single one of his electronic devices, along with the scorebooks for all of the games in the basketball season. He even accompanied the WPD Defendants on a car ride to assist them in retrieving items from his property.

115.    Even Investigator Kirkpatrick was caught on an audio recording expressing shock that Plaintiff was being so cooperative, that he has "nothing to hide" and that **"maybe it [the rape] didn't happen"**.

116.    The WPD Defendants also engaged in oppressive, deceptive, and negligent interrogation techniques.

117.    In his first interview, on December 20, 2017, Sgt. Webster twisted Plaintiff's words and alleged in his report that Plaintiff was caught in multiple lies.

118.    However, Sgt. Webster failed to capture the audio recording of the interview. In his report, he claimed that the recorder malfunctioned despite it being fully functional for all other interviews of Plaintiff.

119.     Thereafter, and apparently without the aid of an audio recording and purportedly from his own memory, Sgt. Webster was able to generate a lengthy 4-page report. The report includes actual quotation marks around Plaintiff's alleged statements to make them appear like verbatim transcriptions of his actual words. Curiously, the report was reviewed and signed by his supervisor *weeks* after the interview occurred.

120.     This police report was leaked and selectively quoted by the news media to paint Plaintiff in a false light.

121.     Upon information and belief, the WPD Defendants either destroyed the recording after selectively transcribing the interview or it was intentionally not recorded so they could manufacture a narrative to justify their materially deficient investigation.

122.     Additionally, when Investigator O'Dea arrived at the school on December 15, 2017, she did not interview the Accuser in complete and total privacy. The Accuser provided her very first statements to WPD while Reusch was present in the room, and immediately after confessing in a room full of faculty members. Upon information and belief, the Accuser's friend who reported the allegations was also present or nearby.

123.     In addition to all of Plaintiff's electronic devices, the WPD Defendants subpoenaed cell phone and email providers for detailed email history, call and text history, and cell phone location data.

124.     Despite this trove of evidence voluntarily provided by Plaintiff, the WPD Defendants did not narrow the date and time of the occurrence. An examination of the data in concert with the fact-specific data points from the Accuser would have provided indisputable evidence that Plaintiff could not have been physically present at the scene of the alleged occurrence.

125.    Instead, the WPD Defendants focused their investigation on the salacious details and lies about Plaintiff's consensual, legal sex life and on baseless rumors concerning his interactions with faculty and students.

126.    Instead of focusing on the time, place, and manner of the serious life-altering rape allegations made by the Accuser, the WPD Defendants embarked on a fishing expedition into Plaintiff's perfectly legal and consensual sex life (which he did not hide).

127.    They interviewed a long line of former girlfriends, faculty members and students who had no discernible connection with the time, place, and manner of the alleged occurrence. Like the School District's investigation, former girlfriends and faculty members used the interviews as an opportunity to smear Plaintiff and air personal grievances about their former legal, consensual physical interactions with him.

128.    In April 2018, after voluntarily providing a cache of evidence and information, Plaintiff finally retained a criminal defense attorney who, upon information and belief, repeatedly asked the district attorney's office to interview relevant witnesses to narrow down the date of the alleged occurrence. These requests were refused.

129.    On January 30, 2019—*one year and forty-six days* after the investigation started, Plaintiff was arrested and charged with rape in the absence of any evidence linking him to the alleged crime, despite exculpatory evidence willfully ignored and tossed aside by the WPD Defendants, and no effort to narrow down the date of the alleged occurrence.

130.    In fact, the indictment was so broad that it covered a *two-month* time period despite clear fact-specific data points from the Accuser's very first interview that made this impossible. The WPD Defendants failed to conduct a *fact-finding* investigation, because they knew they would prove Plaintiff's innocence had they done so.

131.    Upon information and belief, the WPD Defendants (an overwhelmingly white police force with no black police officers) were motivated in whole or in part, overtly or subconsciously, by racial animus and a desire to embarrass and humiliate Plaintiff, because he was a well-liked and accomplished black man having sexual relationships with white women in an overwhelmingly white town.

**E.    Obstruction by the School District**

132.    Shortly after Plaintiff's arrest, Superintendent Gumina, in concert with Principal Benz and Assistant Principal Goodwine, held an "emergency" meeting with the School District faculty members.

133.    Upon information and belief, Plaintiff's cousin-in-law was not allowed to attend this "emergency" meeting.

134.    At the meeting attended by nearly one hundred people, Superintendent Gumina told the faculty members that they were forbidden to communicate with Plaintiff, his attorneys, and his investigators about the case. During the meeting, Superintendent Gumina clearly conveyed that he believed Plaintiff was guilty of the alleged crime. Upon information and belief, at one point, he rolled his eyes when a faculty member asked him if Plaintiff had been convicted yet.

135.    At around this time, Superintendent Gumina, in concert with Principal Benz, Assistant Principal Goodwine, and other agents and employees of the School District attempted to bully Plaintiff's faculty member friends into silence.

136.    For example, without warning, Principal Benz walked into a faculty member's office and randomly asked him how he "was doing with all of this" and then awkwardly repeated the phrase "gotta be careful" numerous times.

137.    Similarly, another colleague's coaching position was threatened, and she was told to "lose Watkin's number."

138.    The bullying was so shocking and pervasive that teachers' union representatives arranged a meeting with Superintendent Gumina and three faculty members who experienced this bullying.

139.    At the meeting held on or about February 15, 2019, Superintendent Gumina confirmed that he directed and sent Principal Benz to confront one of the faculty members for smiling and laughing with Plaintiff at an event.

140.    Superintendent Gumina confirmed that the other colleague was targeted because she allegedly told a staff member that the school district is "railroading [Plaintiff]."

141.    At the meeting, Superintendent Gumina shockingly stated that even innocent people can be guilty of crimes.

142.    By threatening the School District staff and faculty in this manner, Superintendent Gumina, in concert with Principal Benz and Assistant Principal Goodwine, abused their authority and actively interfered with an ongoing criminal investigation and Plaintiff's fundamental right to due process and the presumption of innocence. Superintendent Gumina, in concert with Principal Benz and Assistant Principal Goodwine, also muzzled free speech and association, and denigrated the reputation of Plaintiff in the process.

143.    Around this time, before the trial even started, Superintendent Gumina, in concert with Principal Benz and Assistant Principal Goodwine, sent a letter to the entire Webster community which had the effect of further denigrating the reputation of Plaintiff. Once again, the School District had no regard for the due process rights of Plaintiff, the

integrity of the investigation, and his presumption of innocence.

144.    By their actions, the School District Defendants were involved in and/or directed the arrest and prosecution of Plaintiff.

**F.     Plaintiff's Acquittal**

145.    On August 26, 2019, Plaintiff was found not guilty of all charges against him.

146.    Due to law enforcement's total and utter failure to conduct a fair and impartial investigation, Plaintiff's *own attorneys* were forced to do the police work of narrowing down the two-month time frame in the indictment using the Accuser's own statements and a cache of evidence.

147.    Plaintiff's attorneys made motions to limit the time, and it was not until the day of proof that the date and time of the alleged occurrence was provided by the prosecution: January 5, 2017 at around 3:00 pm.

148.    Plaintiff easily proved that he was not in the girls' locker room at that time. He was at the veterinarian's office with his dog. His attorneys showed text messages between family members discussing the appointment and time stamped receipts from the vet office. Additionally, Plaintiff's daughter, his ex-wife, the veterinarian, and former babysitter all confirmed that he was with the dog at the vet's office on the date and time of the alleged occurrence.

149.    Had the WPD Defendants conducted an objective fact-based investigation, they would have learned the same thing. They would have also learned that Plaintiff had an alibi for any other possible date on the timeline.

150.    Additionally, apart from the Plaintiff's alibi and whereabouts, had the WPD Defendants pinpointed the actual date and time of the alleged occurrence and viewed the

electronic data, they would have learned that the Accuser's story did not make any sense. For example, shortly *after* January 5, 2017, the Accuser was one of the first players to wish Plaintiff happy birthday in a team group text; another text message from *after* January 5th read that she was "chilling with" her coach and his daughter at a tournament; and a text message interaction with Plaintiff several *months after* January 5, 2017 clearly shows that the Accuser was looking forward to participating in both the summer league and the basketball team the following season…*with Plaintiff as coach*.

151.    Instead, due to the unlawful conduct of the WPD Defendants and the School District, Plaintiff was forced to incur thousands of dollars in legal fees, was subjected to a media circus and nearly two years of emotional distress and humiliation. Even after the not-guilty verdict, the stigma continues to follow him and his life will never be the same.

152.    Had Plaintiff not retained an attorney to do the actual police work, the end result could have been a lot worse.

## FIRST CLAIM FOR RELIEF
## MALICIOUS PROSECUTION UNDER NEW YORK LAW
### (Against All Defendants)

153.    Plaintiff repeats, reiterates, and realleges the allegations set forth above with the same force and effect as if fully set forth herein.

154.    By all of the above actions, each and all of the Defendants, jointly and severally, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued and/or caused the initiation or continuation of criminal proceedings against Plaintiff.

155.    Amongst other things as alleged above, Defendants failed to make a complete and full statement of facts to the District attorney, misrepresented or falsified evidence,

withheld evidence, and otherwise acted in bad faith by and through, *inter alia*, their willful blindness, egregious bias, animus, conflicts of interest, and/or obstruction of the legal process.

156.    The criminal proceedings terminated in Plaintiff's favor.

157.    There was no probable cause for the commencement or continuation of the criminal proceedings.

158.    Defendants acted with actual malice and deliberate indifference.

159.    The Town and the WPD employed the WPD Defendants, and the School District employed the School District Defendants, who were at all times agents, servants, and employees acting within the scope of their employment with the Town, the WPD, and the School District, which are therefore responsible for their conduct.

160.    The Town and WPD, as the employer of the individual WPD Defendants and the School District, as the employer of the individual School District Defendants, are responsible for their wrongdoing under the doctrine of *respondeat superior*.

161.    As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed.

162.    Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction and punitive damages.

**SECOND CLAIM FOR RELIEF**
**MALICIOUS PROSECUTION UNDER U.S.C. SECTION 1983**
**(Against All Defendants)**

163.    Plaintiff repeats, reiterates, and realleges the allegations set forth above with the same force and effect as if fully set forth herein.

164.    By all of the above actions, each and all of the Defendants, jointly and severally,

acting in concert with each other and with additional persons for whose acts they are liable, acting under color of state law, initiated, continued and/or caused the initiation or continuation of criminal proceedings against Plaintiff.

165.    Amongst other things as alleged above, Defendants failed to make a complete and full statement of facts to the District attorney, misrepresented or falsified evidence, withheld evidence, and otherwise acted in bad faith by and through, *inter alia*, their willful blindness, egregious bias, animus, conflicts of interest, and/or obstruction of the legal process.

166.    The criminal proceedings terminated in Plaintiff's favor.

167.    There was no probable cause for the commencement or continuation of the criminal proceedings.

168.    Defendants acted with actual malice and deliberate indifference.

169.    These unconstitutional actions were taken *by* and pursuant to policies adopted by the individual defendants who had final policy-making authority in the areas in which they acted; and pursuant to the customs, practices, and policies of the School District, the Town and WPD. Thus, the School District, the Town, and WPD are liable.

170.    Plaintiff endured a sufficient post-arraignment liberty restraint to implicate his Fourth Amendment rights in that he was obligated to appear in court on several occasions in connection with criminal charges after the trial court set bail in the amount of $20,000.

171.    Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction and punitive damages.

**THIRD CLAIM FOR RELIEF**
**CONSPIRACY TO DEPRIVE AND**
**DEPRIVATION OF DUE PROCESS UNDER U.S.C. SECTION 1983**
**(Against School District and School District Defendants)**

172.    Plaintiff repeats, reiterates, and realleges the allegations set forth above with the same force and effect as if fully set forth herein.

173.    By all of the above actions, each and all of the School District Defendants, jointly and severally, acting in concert with each other and with additional persons for whose acts they are liable, acting under color of state law, intentionally and willfully conspired amongst themselves to deprive Plaintiff of rights secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and did in fact deprive him of those rights, in that they:

(i)     Intentionally and maliciously controlled, influenced, manipulated and misled those in charge of the criminal investigation and prosecution of Plaintiff;

(ii)    Intentionally and maliciously tampered with, influenced, coerced, obstructed, and intimidated witnesses so as to facilitate the filing of false criminal charges against Plaintiff;

(iii)   Made false statements to law enforcement so as to facilitate the filing of criminal charges against Plaintiff; and

(iv)    Intentionally and maliciously made false statements to the public and to law enforcement so as to deprive Plaintiff of his liberty interest in his reputation to the point where he lost his job and was in danger of being harmed by others.

174.    These unconstitutional actions were taken *by* and pursuant to policies adopted by the individual defendants who had final policy-making authority in the areas in which they acted; and pursuant to the customs, practices, and policies of the School District. Thus, the

School District is liable.

175.   Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction and punitive damages.

## FOURTH CLAIM FOR RELIEF
## GENDER DISCRIMINATION UNDER TITLE IX
### (Against School District)

176.   Plaintiff repeats, reiterates, and realleges the allegations set forth above with the same force and effect as if fully set forth herein.

177.   Defendant School District is a public school district that receives federal funding.

178.   Plaintiff is a heterosexual male.

179.   At all times herein, Plaintiff was qualified for continued employment with Defendant School District.

180.   Plaintiff suffered an adverse employment action when Defendant School District placed Plaintiff on administrative leave, and ultimately terminated him for false allegations of "grooming" and based on his "pattern" of consensual relationships with female faculty members.

181.   Plaintiff's discipline was an erroneous outcome from a flawed proceeding, in that, *inter alia*, Superintendent Gumina, the person directing and facilitating the proceeding, harbored personal animus towards Plaintiff based on Plaintiff's gender and intimate relationship with the same woman Superintendent Gumina was having an extramarital affair with.

182.   Additionally, the severity of the penalty and/or the decision to initiate the

proceeding was affected by Plaintiff's gender, in that, *inter alia*, none of the other similarly situated female faculty members who had sexual relationships with Plaintiff and with others were disciplined in the same way; and specific statements by the School District's attorney confirm that Plaintiff was punished because he is a heterosexual male and his similarly innocuous treatment of male students would only have been an issue "if [Plaintiff was] gay."

183.    Thus, there is more than minimal evidence suggesting an inference that Defendant School District acted with discriminatory motivation and/or animus.

184.    Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction and punitive damages.

### FIFTH CLAIM FOR RELIEF
### VIOLATION OF EQUAL PROTECTION UNDER U.S.C. SECTION 1983
**(Against School District and School District Defendants)**

185.    Plaintiff repeats, reiterates, and realleges the allegations set forth above with the same force and effect as if fully set forth herein.

186.    Plaintiff is a black male.

187.    By all of the above actions, each and all of the School District Defendants, jointly and severally, acting in concert with each other and with additional persons for whose acts they are liable, acting under color of state law, intentionally and willfully investigated, suspended, terminated, and otherwise disciplined Plaintiff based on his race and gender.

188.    School District Defendants had no compelling government interest in discriminating against Plaintiff on the basis of his race and gender.

189.    As a direct and proximate result of the discriminatory treatment, Plaintiff has suffered and continues to suffer significant injuries, damages, and losses.

190.     These unconstitutional actions were taken *by* and pursuant to policies adopted by the individual defendants who had final policy-making authority in the areas in which they acted; and pursuant to the customs, practices, and policies of the School District. Thus, the School District is liable.

191.     School District Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard for Plaintiff's constitutional rights.

192.     Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction and punitive damages.

### SIXTH CLAIM FOR RELIEF
### DISCRIMINATION UNDER 42 U.S.C. SECTIONS 1981 AND 1983
### (Against School District and School District Defendants)

193.     Plaintiff repeats, reiterates, and realleges the allegations set forth above with the same force and effect as if fully set forth herein.

194.     At all relevant times, Plaintiff was an employee of the School District.

195.     Plaintiff is black and thus a member of a protected class under Section 1981.

196.     This employment relationship encompasses sufficient contractual rights to support a Section 1981 claim for a discriminatory investigation and termination.

197.     By all of the above actions, each and all of the School District Defendants, jointly and severally, acting in concert with each other and with additional persons for whose acts they are liable, acting under color of state law, violated the strictures of Section 1981, by discriminatorily failing to "make and enforce" the contractual relationship in investigating Plaintiff and terminating his employment.

198.     At all relevant times, Plaintiff was qualified to perform his job responsibilities,

and he performed his job responsibilities satisfactorily at all times.

199.   Defendants denied Plaintiff the protections provided by Section 1981 in the terms and conditions of his employment by engaging in a discriminatory investigation and termination based on his race.

200.   Plaintiff's race was a motivating factor in the Defendants' decision to investigate and terminate him, even though similarly situated white faculty members were not investigated or terminated for similar legally permitted activities.

201.   These unconstitutional actions were taken *by* and pursuant to policies adopted by the individual defendants who had final policy-making authority in the areas in which they acted; and pursuant to the customs, practices, and policies of the School District. Thus, the School District is liable.

202.   School District Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard for Plaintiff's constitutional rights.

203.   Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction and punitive damages.

**SEVENTH CLAIM FOR RELIEF**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against School District and School District Defendants)**

204.   Plaintiff repeats, reiterates, and realleges the allegations set forth above with the same force and effect as if fully set forth herein.

205.   Superintendent Gumina, by and through, Principal Benz and Assistant Principal Goodwine, used the force of their authority on behalf of the School District, in concert with Reusch, Exner, and other agents and/or employees, to engage in a continuing

course of conduct in starting an internal investigation and obstructing a criminal investigation, all arising out of Superintendent Gumina's personal and racial animus against Plaintiff.

206.    In a continuing scheme, Superintendent Gumina, by and through, Principal Benz and Assistant Principal Goodwine, used the force of their authority on behalf of the School District, in concert with Reusch, Exner, and other agents and/or employees, to intentionally and maliciously harm Plaintiff for having engaged in an intimate relationship with the woman that Superintendent Gumina was having an extramarital affair with.

207.    In a continuing scheme, Superintendent Gumina, by and through, Principal Benz and Assistant Principal Goodwine, used the force of their authority on behalf of the School District, in concert with Reusch, Exner, and other agents and/or employees,   to publicly make false, reckless, malicious, and defamatory statements and assumptions about the guilt of Plaintiff and used the force of their authority to muzzle faculty and staff and to explicitly demand that they not provide exculpatory evidence or assist in the defense of Plaintiff in his criminal prosecution.

208.    Upon information and belief, this ongoing conduct continued from November 2017 through and until at least August 2019.

209.    The conduct of Defendants is so outrageous in character, and so extreme in degree.

210.    Defendants intended to cause and/or disregarded a substantial probability of causing, severe emotional distress.

211.    Defendants' actions indeed caused severe emotional distress.

212.    The School District employed the individual defendants, who were at all times agents, servants, and employees acting within the scope of their employment with the School

District, which is therefore responsible for their conduct.

213.   The School District, as the employer of the individual defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

214.   As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed.

215.   Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction, including punitive damages.

**EIGHTH CLAIM FOR RELIEF**
**PRIMA FACIE TORT**
**(Against School District and School District Defendants)**

216.   Plaintiff repeats, reiterates, and realleges the allegations set forth above with the same force and effect as if fully set forth herein.

217.   In the event the acts of Defendants are determined to be lawful but done intentionally to harm Plaintiff without excuse or justification, then Plaintiff demands judgment against Defendants.

218.   The School District employed the individual defendants, who were at all times agents, servants, and employees acting within the scope of their employment with the School District, which is therefore responsible for their conduct.

219.   The School District, as the employer of the individual defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

220.   As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed.

221.   Watkins has incurred special damages, including lost earnings from teaching

and coaching and the expenditure of legal fees.

222.     Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction, including punitive damages.

**NINTH CLAIM FOR RELIEF**
**MONELL LIABILITY**
**(Against the Town, WPD, and the School District)**

223.     Plaintiff repeats, reiterates, and realleges the allegations set forth above with the same force and effect as if fully set forth herein.

224.     Even a single act by an official with final policy-making authority is sufficient to confer liability on a municipality under Section 1983.

225.     Both Superintendent Gumina and Chief Rieger, as the chief executive officers of the School District and the WPD, respectively, are final policy makers.

226.     As alleged herein, both Superintendent Gumina and Chief Rieger had extreme bias, conflicts of interests, and animus towards Plaintiff, and should have recused themselves from the investigations.

227.     Despite the foregoing, both Superintendent Gumina and Chief Rieger directed, supervised, facilitated, and actively participated in the investigations that form the basis of this lawsuit.

228.     Accordingly, the acts alleged herein were ratified, approved, and executed by officials with final policy-making authority. Thus, the School District, WPD, and the Town are liable.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury for all issues so triable.

WHEREFORE, Plaintiff demands judgment against Defendants on each cause of action as set forth above in an amount which exceeds the jurisdictional limits of all lower courts including punitive damages as applicable, together with the interest, costs and disbursements of this action, attorney's fees and costs pursuant to 42 U.S.C. Section 1988, and for such other relief as this Court deems just and proper.

DATED:  April 14, 2021

**HASHMI LAW FIRM**

/s/ Kamran F. Hashmi
Kamran F. Hashmi, Esq.
133 S. Fitzhugh Street
Rochester, New York 14608
Tel: (585) 802-1253
kamran@rocattorney.com

*Attorneys for Plaintiff Kali Watkins*