UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KALI WATKINS,

                    Plaintiff,

    v.

TOWN OF WEBSTER, WEBSTER
POLICE DEPARTMENT, JOSEPH
RIEGER, ALEX KIRKPATRICK,
GRETCHEN O'DEA, JEFFREY
WEBSTER, WEBSTER CENTRAL
SCHOOL DISTRICT, CARMEN
GUMINA, PAUL BENZ, JACQUELINE
GOODWINE, STEPHANIE REUSCH,
STACEY EXNER, AND JOHN AND
JANE DOE(S),

                    Defendants.

_____

**DECISION AND ORDER**

6:21-CV-06233 EAW

## INTRODUCTION

Plaintiff Kali Watkins ("Plaintiff") brings this action alleging violations of his constitutional rights under the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983, asserting claims for malicious prosecution, conspiracy to deprive and deprivation of due process, equal protection, race discrimination, gender discrimination, intentional infliction of emotional distress, and *prima facie* tort. (Dkt. 7).

Presently before the Court is a motion to dismiss and for partial summary judgment filed by the Webster Central School District, Carmen Gumina, Paul Benz, Jacqueline Goodwine, Stephanie Reusch, and Stacey Exner (collectively, the "School District Defendants") (Dkt. 9), and a motion to dismiss filed by the Town of Webster, the Town of

Webster Police Department ("WPD"), Joseph Rieger,[1] Alex Kirkpatrick, Gretchen O'Dea, and Jeffrey Webster (collectively, the "Town Defendants") (Dkt. 11).

For the reasons explained below, the School District Defendants' motion for summary judgment is granted on Plaintiff's due process claim, and their motion to dismiss is granted in part and denied in part so that Plaintiff's equal protection claim pursuant to 42 U.S.C. § 1983 (including any claim pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)) may proceed to discovery, but Plaintiff's malicious prosecution, individual official capacity, punitive damages, Title IX, 42 U.S.C. § 1981, and state law claims against the School District Defendants are dismissed.  Further, the motion to dismiss filed by the Town Defendants is granted in part and denied in part so that the claims against the WPD are dismissed, as are the official capacity claims against the individual defendants and any claims for punitive damages, but the malicious prosecution claims (including those based on a *Monell* theory of liability) may proceed to discovery.

## BACKGROUND

The following facts are taken from Plaintiff's complaint.  (Dkt. 7).  For purposes of the motions to dismiss, the Court treats Plaintiff's factual allegations as true.

Plaintiff's claims stem from the 2017 investigation and subsequent criminal prosecution of Plaintiff for the alleged rape of a fifteen-year-old girl who played on the

---

[1]    The docket lists the spelling of Joseph Rieger's last name as "Reiger."  Upon reviewing the docket, the Court notes that the case caption listed on the Notice of Removal (Dkt. 1) spells his last name as "Reiger," but all subsequent filings, including Plaintiff's complaint, spell his name as "Rieger."  (*See, e.g.*, Dkt. 7).  Accordingly, the clerk's office is directed to correct the spelling of Joseph Rieger's last name on the docket, so that it is listed as "Rieger."

junior varsity basketball team he coached in the Webster Central School District ("WCSD"). (*Id*.). On August 26, 2019, a jury acquitted Plaintiff after trial. (*Id*. at ¶ 145). Plaintiff alleges that the investigation against him was "biased" and "tainted with animus," including because it was led by a conflicted police department and school superintendent. (*Id*. at ¶¶ 1-11).

Plaintiff was a physical education teacher and coach in the Rochester, New York area. (*Id*. at ¶ 37). In 2015, he was hired to teach ninth grade special education at Webster Schroeder High School. (*Id*. at ¶ 39). He also coached the varsity boys football team from 2006 until 2017, and the junior varsity girls basketball team from 2008 to 2017. (*Id*. at ¶ 40). Plaintiff is a black male and was the only black teacher in the school district. (*Id*. at ¶ 41).

Plaintiff alleges that in 2017, Superintendent Carmen Gumina ("Superintendent Gumina") was having an extramarital affair with a female faculty member. (*Id*. at ¶ 51). Superintendent Gumina discovered the faculty member was also engaged in an intimate physical relationship with Plaintiff, which caused him to be jealous and angry at Plaintiff. (*Id*. at ¶¶ 53-54). Plaintiff had various encounters with Superintendent Gumina he describes as "shocking," including that in Spring 2017, at a school event about racism, Superintendent Gumina told Plaintiff that white privilege does not exist and "things are not like that in Webster." (*Id*. at ¶¶ 47-48).

In November 2017, Plaintiff was directed to appear for a meeting at the School District Office. (*Id*. at ¶ 55). Present at the meeting were Superintendent Gumina, the School District's attorney, and two Webster Teachers Association Representatives. (*Id*. at

¶ 56).   The attorney informed Plaintiff they suspected he was having an inappropriate relationship with a student and "grooming" her.  (*Id*. at ¶ 57).  Plaintiff "laughed out loud" at the suggestion and informed them that the student was "like [his] daughter," he knew her parents and attended her softball games, and he gave her free t-shirts from sponsors, like he gave to other students, custodians, secretaries, and Superintendent Gumina himself. (*Id*. at ¶¶ 57-58).  Plaintiff stated he treated the girl like he treated his male students, and the attorney responded that the school would hypothetically investigate such allegations involving a male student "if you were gay."  (*Id*. at ¶ 59).

Plaintiff was informed the investigation against him would continue, and he further alleges that the investigation was "authorized, planned, and directed" by Superintendent Gumina on behalf of the school district.  (*Id*. at ¶¶ 60-61).  On November 17, 2017, Plaintiff was placed on administrative leave and informed he had the "opportunity to resign," while the school district continued to investigate.  (*Id*. at ¶ 62).   Superintendent Gumina told Plaintiff that "gifts are not right," and also referenced Plaintiff's "pattern" of consensual relationships with female faculty members, despite that other faculty members engaged in similar relationships.  (*Id*. at ¶¶ 63-64).   The school district, through Superintendent Gumina, Principal Paul Benz ("Principal Benz") and Assistant Principal Jacqueline Goodwine ("AP Goodwine") also hired a private investigator to follow and spy on Plaintiff, including because Superintendent Gumina wanted to discover if his extramarital partner was still involved with Plaintiff, but the surveillance uncovered nothing suspicious.  (*Id*. at ¶¶ 65-67).  On November 17, 2017, the same day Plaintiff was placed on administrative leave and before the investigation concluded, Superintendent Gumina told another faculty

member that he had no intention of bringing Plaintiff back (*id*. at ¶ 79), and Superintendent Gumina also stated in a letter that he intended to terminate Plaintiff's position at a board meeting on December 27, 2017 (*id*. at ¶ 85).

Plaintiff alleges that the "grooming" allegations did not come from the student, and both the student and her mother denied any inappropriate relationship. (*Id*. at ¶ 68). Rather, the allegations were orchestrated by Stacey Exner ("Exner") and Stephanie Reusch ("Reusch"), who were both school psychologists and close personal friends. (*Id*. at ¶ 69). Plaintiff previously had an intimate personal relationship with Exner, but they had a "falling out." (*Id*. at 70). Plaintiff alleges that Exner knew Plaintiff was a source of moral support to the student who was dealing with her parents' divorce (*id*. at ¶ 71), but after Plaintiff terminated his personal relationship with her, she conspired with Reusch to get Plaintiff in trouble (*id*. at ¶ 73). Specifically, Exner and Reusch met with the student to ask if Plaintiff was "grooming" her and showed her the dictionary definition of what "grooming" meant, but the student denied there was any inappropriate conduct. (*Id*. at ¶¶ 74, 76). Plaintiff alleges the investigation against him was "willfully negligent," and resulted in leaks and rumors which were propagated by students and faculty members, and expanded beyond allegations of "grooming," and instead "became a fishing expedition" into Plaintiff's legal and consensual sex life, which other faculty members and Superintendent Gumina himself engaged in, without punishment. (*Id*. at ¶¶ 80-83).

Plaintiff alleges that "against the backdrop of this circus-like atmosphere," a player on the junior varsity girls basketball team (the "accuser") was "emboldened to falsely accuse Plaintiff of the appalling crime of rape." (*Id*. at ¶ 87). The accuser made these

allegations at a sleepover with her friend where they were under the influence of drugs and/or alcohol.  (*Id*. at ¶ 89).  The accuser told her friend that one year prior, Plaintiff told her to report early for a basketball game and then committed the act in the girls locker room before the game.  (*Id*.).  The accuser's friend informed Reusch of these allegations.  (*Id*. at ¶ 90).  Reusch did not contact law enforcement or speak with the accuser in private, but on December 15, 2017, confronted the accuser in a room with school administrators and her own father.  (*Id*. at ¶¶ 91-92).

That same day, the WPD initiated an investigation directed by Chief Joseph Rieger ("Chief Rieger") and carried out by Investigator Gretchen O'Dea ("Investigator O'Dea"), Investigator Alex Kirkpatrick ("Investigator Kirkpatrick"), Sergeant Jeffrey Webster ("Sergeant Webster"), and other agents or employees of WPD (collectively, the "WPD Defendants").  (*Id*. at ¶ 93).  Plaintiff alleges that the WPD should have recused itself, including because Chief Rieger and his daughter were biased, material fact witnesses in the case, as his daughter was a teammate and close friend of the accuser, and Chief Rieger regularly attended basketball games and drove the accuser home from games.  (*Id*. at ¶¶ 94-95).  Further, Chief Rieger was a close friend of Superintendent Gumina, and Plaintiff's "fiery coaching style" was not well received by some individuals in the community, including Chief Rieger and his daughter, who "intensely disliked" Plaintiff.  (*Id*. at ¶¶ 96-98).

Plaintiff alleges that the WPD Defendants conducted a biased, reckless, and grossly negligent investigation against him.  (*Id*. at ¶ 100).  The accuser was not able to pinpoint a specific date on which the rape occurred, but she did inform the WPD Defendants that it

occurred: in the girls locker room; on a bench; before a home game; on a school day; either right before or right after Christmas break in 2016 to 2017; when there was snow on the ground; when the accuser was benched for the entire game; when the accuser's father did not attend the game; when the accuser's mother was late to pick her up from the game and the accuser was angry at her; and on a game day where the accuser did not attend school the day prior.  (*Id*. at ¶¶ 101-02).

Plaintiff alleges that despite being provided these "data points served on a platter," the WPD Defendants did not investigate the case to confirm the date of the occurrence or the legitimacy of the accuser's allegations.  (*Id*. at ¶ 103).   For example, the WPD Defendants did not locate or interview witnesses who may have had knowledge about the time, place, and manner of the incident, and interviewed only one player on the basketball team—Chief Rieger's daughter.  (*Id*. at ¶¶ 104-05).  The interview focused on her dislike of Plaintiff, rather than on the relationship between the accuser and Plaintiff.  (*Id*. at ¶ 105). Plaintiff identifies additional deficiencies in the investigation conducted by the WPD Defendants: no other players on the team were questioned; the WPD Defendants failed to question Plaintiff's daughter, who arrived at games with Plaintiff; they failed to interview assistant coaches, despite their having access to the locker room and spending time with Plaintiff and the accuser; they failed to interview Meredith Ermstrom, the girls' physical education teacher, whose office window looked directly into the locker room; they failed to interview anyone else at the school who would have been present near the girls locker room, including janitors, security personnel, teachers, or other faculty members; they failed to use any information gleaned from Plaintiff's or the accuser's electronic devices to locate

exculpatory witnesses, narrow the timeframe, or confirm the accuser's allegations; and they failed to examine or take measurements of the bench on which the incident allegedly occurred, and had they done so, they would have discovered it would have been physically impossible to have occurred there, given the weight and dimensions of the bench. (*Id.* at ¶¶ 106-12). Plaintiff was cooperative in the investigation, including by answering all questions, consenting to the search of his property, and turning over his electronic devices. (*Id.* at ¶ 114). Investigator Kirkpatrick commented that maybe Plaintiff had "nothing to hide," and "maybe it [the rape] didn't happen." (*Id.* at ¶ 115). Plaintiff alleges that, had the WPD Defendants reviewed the data provided to them by Plaintiff in connection with the information from the accuser, it "would have provided indisputable evidence that Plaintiff could not have been physically present at the scene of the alleged occurrence." (*Id.* at ¶ 124). Instead, the WPD Defendants focused their investigation on Plaintiff's legal and consensual sex life, including by interviewing former girlfriends, as well as faculty members and students who had no connection to the alleged occurrence. (*Id.* at ¶¶ 125-27).

Sergeant Webster interviewed Plaintiff on December 20, 2017. (*Id.* at ¶ 117). Plaintiff alleges that Sergeant Webster did not record the interview—in his report, he stated the recorder had malfunctioned—and the four-page report of the interview, which was reviewed and signed weeks after the interview occurred, "twisted Plaintiff's words" and stated that Plaintiff was caught in multiple lies. (*Id.* at ¶¶ 117-18). Plaintiff alleges that the police report was leaked to the news media, and the WPD Defendants either destroyed the recording after selectively transcribing the interview, or it was intentionally not

recorded.  (*Id*. at ¶¶ 120-21).   Further, Plaintiff alleges that when Investigator O'Dea interviewed the accuser on December 15, 2017, she did not conduct the interview in total privacy—rather, the accuser gave her first statements while Reusch was in the room, and immediately after confessing to a room full of faculty members.  (*Id*. at ¶ 122).

Plaintiff retained a criminal defense attorney in April 2018, who asked the District Attorney's office to interview relevant witnesses to narrow the date of the alleged occurrence.  (*Id*. at ¶ 128).  These requests were refused, and on January 30, 2019, Plaintiff was arrested and charged with rape, without any evidence linking him to the crime, and despite exculpatory evidence that was ignored by the WPD Defendants.  (*Id*. at ¶ 129).  The indictment against Plaintiff covered a two-month period during which the incident allegedly occurred.  (*Id*. at ¶ 130).  Plaintiff alleges that the WPD Defendants, an overwhelmingly white police force with no black officers, "were motivated in whole or in part, overtly or subconsciously, by racial animus and a desire to embarrass and humiliate Plaintiff, because he was a well-liked and accomplished black man having sexual relationships with white women in an overwhelmingly white town."  (*Id*. at ¶ 131).

Shortly after Plaintiff's arrest, Superintendent Gumina, in concert with Principal Benz and AP Goodwine, held an "emergency" meeting with the school district faculty members, during which he told faculty members they were forbidden from communicating with Plaintiff, his attorneys, and his investigators about the case.  (*Id*. at ¶¶ 132, 134).  Superintendent Gumina also "clearly conveyed that he believed Plaintiff was guilty of the alleged crime."  (*Id*. at ¶ 134).  Superintendent Gumina, Principal Benz, and AP Goodwine also began attempting to bully Plaintiff's faculty member friends into silence.  (*Id*. at

¶ 135).   For example, Principal Benz went to another faculty member's office without warning, asked him how he "was doing with all of this," and then repeated the phrase "gotta be careful" numerous times.   (*Id*. at ¶ 136).   Another colleague's coaching position was threated, and she was instructed to "lose Watkin's number."   (*Id*. at ¶ 137).   Plaintiff alleges this bullying became so pervasive that teachers union representatives arranged a meeting with Superintendent Gumina and three faculty members who experienced bullying; at the meeting on February 15, 2019, Superintendent Gumina confirmed he sent Principal Benz to confront one of the faculty members for smiling and laughing with Plaintiff at an event. (*Id*. at ¶¶ 138-39).   Superintendent Gumina also confirmed that the other colleague was targeted because she told a staff member that the school district was "railroading Plaintiff." (*Id*. at ¶ 140).   Superintendent Gumina also stated at this meeting that even innocent people can be guilty of crimes.   (*Id*. at ¶ 141).   Also around this time and prior to Plaintiff's trial, Superintendent Gumina, in concert with Principal Benz and AP Goodwine, sent a letter to the entire Webster community, "which had the effect of further denigrating the reputation of Plaintiff."   (*Id*. at ¶ 143).   Plaintiff alleges that by engaging in this conduct, Superintendent Gumina, Principal Benz, and AP Goodwine "abused their authority and actively interfered with an ongoing criminal investigation and Plaintiff's fundamental right to due process and the presumption of innocence."   (*Id*. at ¶ 142).

Plaintiff was ultimately found not guilty of all the charges against him on August 26, 2019.   (*Id*. at ¶ 145).   Plaintiff alleges that due to law enforcement's failure to properly investigate the case his attorneys were forced to narrow the time frame for when the rape occurred and made motions to limit the time.   (*Id*. at ¶¶ 146-47).   The prosecution provided

the date and time the alleged incident occurred—January 5, 2017, at around 3:00 p.m.—on the date of proof. (*Id*. at ¶ 147). Plaintiff "easily proved" he was not in the girls locker room at that time, but was at the veterinarian's office with his dog, which was supported by text messages between family members discussing the appointment and time stamped receipts from the vet office. (*Id*. at ¶ 148). Plaintiff's daughter, his ex-wife, the veterinarian, and former babysitter also confirmed Plaintiff was with the dog at the vet's office at the time of the alleged rape. (*Id*.). Plaintiff alleges that, had the WPD Defendants conducted an objective, fact-based investigation, they would have learned Plaintiff had an alibi. (*Id*. at ¶ 149). Plaintiff further alleges that, had the WPD Defendants pinpointed the actual date and time of the alleged rape, and reviewed the electronic data, they would have learned the accuser's story "did not make any sense," giving the following examples: "shortly *after* January 5, 2017, the Accuser was one of the first players to wish Plaintiff happy birthday in a team group text; another text message from *after* January 5th read that she was 'chilling with' her coach and his daughter at a tournament; and a text message interaction with Plaintiff several _months_ *after* January 5, 2017 clearly shows that the Accuser was looking forward to participating in both the summer league and the basketball team the following season . . . *with Plaintiff as coach*." (*Id*. at ¶ 150).

Plaintiff alleges that due to the aforementioned conduct, he was forced to incur thousands of dollars in legal fees, and he was subjected to a media circus, and nearly two years of emotional distress and humiliation. (*Id*. at ¶ 151).

## PROCEDURAL HISTORY

Plaintiff filed a Summons with Notice in Monroe County Supreme Court on or about November 18, 2020, which the Webster Town Clerk received on March 5, 2021.  (Dkt. 1 at ¶ 2).  On March 11, 2021, with the consent of the School District Defendants, the Town Defendants timely filed a Notice of Removal pursuant to 28 U.S.C. § 1331, as Plaintiff's case involves alleged violations of his constitutional rights.  (*Id*. at ¶¶ 10-12; *see also* Dkt. 1-1 at 3-6 (Summons with Notice, alleging civil rights violations pursuant to 42 U.S.C. § 1983, and other applicable federal laws)).

In response to Defendants' Demand for Complaint (*see* Dkt. 1-3; Dkt. 4), Plaintiff filed his complaint on April 14, 2021, asserting nine causes of action: (1) malicious prosecution under New York law, against all Defendants; (2) malicious prosecution under 42 U.S.C. § 1983, against all Defendants; (3) conspiracy to deprive and deprivation of due process under 42 U.S.C. § 1983, against the School District Defendants; (4) gender discrimination under Title IX, against the WCSD; (5) equal protection pursuant to 42 U.S.C. § 1983 alleging unequal treatment based on his race and gender, against the School District Defendants; (6) race discrimination under 42 U.S.C. §§ 1981 and 1983, against the School District Defendants; (7) intentional infliction of emotional distress under New York law, against the School District Defendants; (8) *prima facie* tort under New York law, against the School District Defendants; and (9) a claim for *Monell* liability, against the Town of Webster, the WPD, and WCSD.  (Dkt. 7).

On May 26, 2021, the School District Defendants filed a motion to dismiss and for partial summary judgment (Dkt. 9), and the Town Defendants filed a motion to dismiss

(Dkt. 11). Plaintiff filed response papers on July 23, 2021 (Dkt. 18; Dkt. 19), and Defendants replied on August 18, 2021 (Dkt. 22; Dkt. 23). The Court held oral argument on January 31, 2022, and reserved decision. (Dkt. 26; Dkt. 28).

## **DISCUSSION**

I.     **The School District Defendants' Motion for Partial Summary Judgment**

  A. **Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory

allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358.  Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

### B. Plaintiff's Conspiracy to Deprive and Deprivation of Due Process Claim Against the School District Defendants (Third Cause of Action)

The School District Defendants contend they are entitled to summary judgment on Plaintiff's due process claims because Plaintiff, as a probationary teacher in the WCSD, had no substantive due process rights and was afforded sufficient procedural due process for his termination.  (*See* Dkt. 9-1 at ¶ 11; Dkt. 9-3 at ¶¶ 8, 10; Dkt. 9-4 at 22-23); *see also Desir v. Bd. of Co-op Educ. Servs.*, No. 07-CV-1994 (RRM)(MJO), 2008 WL 4508735, at *2 (E.D.N.Y. Sept. 30, 2008) ("Under New York law, it is well-settled that service as a probationary teacher does not confer a property right sufficient to establish a § 1983 substantive due process claim."); *Castro v. N.Y.C. Bd. of Educ.,* 777 F. Supp. 1113, 1117 (S.D.N.Y. 1990) ("It is well settled under New York law that a probationary employee has no property rights in his employment and may be terminated for 'almost any reason or no reason at all,'" and "is therefore not entitled to a hearing, unless such an employee can

show a violation of statutory law or a constitutionally impermissible purpose underlying the termination." (citations omitted)), *aff'd*, 923 F.2d 844 (2d Cir. 1990).

Plaintiff does not oppose the School District Defendants' motion for summary judgment on his due process claims and in his response papers, states that he "withdraws and stipulates to dismiss his third cause of action – Conspiracy and Deprivation of Due Process." (*See* Dkt. 19 at 7). Plaintiff confirmed the same at oral argument on January 31, 2022. Accordingly, the motion for summary judgment filed by the School District Defendants is granted, and Plaintiff's third cause of action for conspiracy to deprive and deprivation of due process is dismissed.

## II.     Motions to Dismiss

### A. Standard

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). To withstand dismissal, a plaintiff must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

### B. The Town Defendants' Motion to Dismiss

As explained above, Plaintiff asserts against the Town Defendants the following causes of action: malicious prosecution under New York law; malicious prosecution in violation of § 1983; and a claim for *Monell* liability against the Town of Webster and the WPD. (*See* Dkt. 7).

As an initial matter, the Court agrees with the Town Defendants that the WPD is not a proper party in this case and must be dismissed. (*See* Dkt. 11-1 at 15); *see also Loria v. Town of Irondequoit*, 775 F. Supp. 599, 606 (W.D.N.Y. 1990) (granting motion to dismiss police department, and explaining that "[i]n New York, departments like the defendant, which are merely administrative arms of a municipal corporation, do not have a legal identity separate and apart from the town."). This is because the WPD is not a legally separate entity from the Town of Webster and is not a proper party to be sued. In

his response papers, Plaintiff concedes the WPD is an improper party and his claims against it should be dismissed (*see* Dkt. 18 at 6), and he also confirmed at oral argument that dismissal of the WPD is appropriate.  Accordingly, Plaintiff's claims against the WPD are dismissed, and the Clerk of Court is directed to terminate the WPD as a defendant to this action.

Likewise, in his opposition papers and in response to arguments advanced by the School District Defendants, Plaintiff conceded that his "official capacity claims" against the individually named defendants are redundant and should be dismissed, and also that punitive damages are not available against the WCSD.  (*See* Dkt. 19 at 7; *see also* Dkt. 9-4 at 31-32, 40); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("we find that considerations of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials").  At oral argument on January 31, 2022, Plaintiff confirmed he agreed these forms of relief also are not available as to the Town Defendants. Accordingly, to the extent Plaintiff brings his claims against the individual Town defendants in their official capacities, or seeks to recover punitive damages from the Town of Webster, those claims are dismissed.

### 1.  Malicious Prosecution Claims

The Court turns now to Plaintiff's malicious prosecution claims.  To state a claim for malicious prosecution under Section 1983, a plaintiff must allege "a seizure or other

perversion of proper legal procedures implicating [his] personal liberty and privacy interests under the Fourth Amendment," and also "that criminal proceedings were initiated or continued against him, with malice and without probable cause, and were terminated in his favor." *Lanning v. City of Glens Falls*, 908 F.3d 19, 24 (2d Cir. 2018) (alteration in original) (citations omitted). Likewise, "[t]o establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *Manganiello v. City of N.Y.*, 612 F.3d 149, 161 (2d Cir. 2010)). Because "[t]he elements of malicious prosecution under section 1983 are 'substantially the same' as the elements under New York law . . . 'the analysis of the state and the federal claims is identical.'" *Bailey v. City of N.Y.*, 79 F. Supp. 3d 424, 448 (E.D.N.Y. 2015) (quoting *Boyd v. City of N.Y.*, 336 F.3d 72, 75 (2d Cir. 2003)).

Plaintiff has plausibly alleged a claim for malicious prosecution against the Town Defendants. As further explained below, Plaintiff has alleged that criminal proceedings were initiated against him (*see* Dkt. 7 at ¶¶ 1, 129), and also that they were terminated in his favor (*id*. at ¶¶ 1, 145). Also as further explained below, Plaintiff has alleged a lack of probable cause. Likewise, Plaintiff has alleged actual malice as a motivation for the charges. (*See id*. at ¶¶ 94-98 (alleging that Chief Rieger, who directed the investigation, and his daughter were biased and material fact witnesses in the case, Chief Rieger had a

close personal relationship with Superintendent Gumina, and Chief Rieger "intensely disliked" Plaintiff due to his coaching style)).

The Town Defendants argue that Plaintiff's malicious prosecution claims must be dismissed for several reasons, including because allegations of investigatory negligence are insufficient to state a claim for malicious prosecution (Dkt. 11-1 at 19-20), and he has failed to plausibly allege facts sufficient to overcome the presumption of probable cause created by the grand jury indictment (*id*. at 23-26). Further, the Town Defendants argue that Plaintiff has failed to plead personal involvement on the part of the individual officers, he has not alleged that they "initiated" criminal proceedings against him, and he has failed to allege that they acted with malice. (*Id*. at 17-23, 26-27).

The Town Defendants' arguments ask the Court "to analyze myopically each allegation in isolation rather than viewing them cumulatively." *See, e.g., Vazquez v. City of N.Y.*, No. 10-CV-6277 JMF, 2014 WL 4388497, at *9 (S.D.N.Y. Sept. 5, 2014). For example, in their motion papers, the Town Defendants break down specific actions taken by each individual defendant, arguing that those specific, isolated actions do not amount to a constitutional violation. (*See, e.g.,* Dkt. 11-1 at 21-23). However, at this early stage of the proceedings the Court is required to view Plaintiff's allegations as a whole when determining whether Plaintiff has plausibly alleged a constitutional violation. *See Vazquez*, 2014 WL 4388497, at *9 (allegations in complaint should be viewed "cumulatively").

To satisfy the first element of a claim for malicious prosecution—initiation of a criminal proceeding—a plaintiff must allege that "the defendant 'play[ed] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities

to act.'"  *Bailey*, 79 F. Supp. 3d at 448-49 (alteration in original) (quoting *Manganiello*, 612 F.3d at 163); *see also Rohman v. N.Y.C. Transit Auth.,* 215 F.3d 208, 217 (2d Cir. 2000).   While "[t]he requirement that a plaintiff show an initiation or continuation of a criminal proceeding by the defendant may be satisfied by a showing that the defendant filed formal charges and caused the plaintiff to be arraigned," *see, e.g., Phillips v. DeAngelis*, 571 F. Supp. 2d 347, 353 (N.D.N.Y. 2008), *aff'd*, 331 F. App'x 894 (2d Cir. 2009), it is not the only way to satisfy this element.   For example, "'[g]iving information to the police that is known to be false qualifies as the commencement of a prosecution,'" and "although malicious prosecution claims are usually made against arresting or prosecuting officials, they can also be brought against individuals other than the arresting officer when such a person actively engaged in a plaintiff's prosecution."  *TADCO Constr. Corp. v. Dormitory Auth. of N.Y.*, 700 F. Supp. 2d 253, 270 (E.D.N.Y. 2010) (citation omitted).

The complaint makes clear that criminal proceedings were initiated against Plaintiff. (*See* Dkt. 7 at ¶ 129 (Plaintiff was arrested and charged with rape on January 30, 2019)). The complaint contains specific allegations explaining the involvement of each individual defendant in the investigation of the criminal charges against Plaintiff.   For example, Plaintiff alleges that the WPD "initiated an investigation . . . directed by Chief Rieger and carried out by Investigator O'Dea, Investigator Kirkpatrick, Sgt. Webster, and other agents and/or employees of WPD."  (*Id*. at ¶ 93).   Chief Rieger directed the investigation even though he should have recused himself due to a clear conflict of interest.  (*Id*. at ¶¶ 93-100).   The complaint also contains allegations detailing the involvement of each individual

defendant in the investigation and subsequent charges Plaintiff alleges violated his constitutional rights, including their failure to adequately investigate the claims against him and to identify exculpatory evidence, and the use of improper interview techniques. (*See, e.g., id.* at ¶¶ 100-127 (discussing collection of evidence and "numerous interviews" conducted by the officers, including by Sergeant Webster and Investigator O'Dea)). In other words, this is not a case where Plaintiff attempts to hold any individual defendant liable simply by virtue of their position or authority.

In connection with their argument that Plaintiff has failed to adequately plead the "initiation" element of a malicious prosecution claim, the Town Defendants argue that once a criminal defendant has been formally charged, the chain of causation between the officer's conduct and the alleged constitutional violation is broken by intervening acts by the prosecutor. (*See* Dkt. 11-1 at 20). They also imply that a plaintiff alleging a malicious prosecution claim "must demonstrate that officers initiated criminal proceedings by having the plaintiff arraigned, by filling out complaining and corroborating affidavits, and by signing felony complaints." (*Id.*). The Court disagrees. "[A] police officer who fabricated evidence and forwarded that evidence to a prosecutor (who used it against a defendant) would remain liable for the consequences of his misconduct." *Zahrey v. Coffey*, 221 F.3d 342, 353 n.10 (2d Cir. 2000). In other words, when the prosecutor is in receipt of evidence which is the product of police conduct undertaken in bad faith and then uses that evidence in the resulting prosecution, the chain of causation is not broken. *See, e.g., Cameron v. City of N.Y.*, 598 F.3d 50, 64 (2d Cir. 2010) (explaining that while certain "dicta . . . acknowledges that a complaining *layperson* might not be responsible for a prosecution if

prosecutors go forward based on independent, untainted evidence . . . it would not appear that it has *any* application where a police officer is alleged to have maliciously misled a prosecutor."); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (explaining that for malicious prosecution claim, police officer can "play[ ] a role in initiating the prosecution by preparing the alleged false confession and forwarding it to prosecutors").

Here, Plaintiff identifies specific alleged misconduct by the police officer defendants relating to the evidence collected during the investigation, with the fair inference that it was forwarded to prosecutors.  (*See, e.g.*, Dkt. 7 at ¶¶ 93-100 (describing biased investigation conducted by Chief Rieger); *id*. at ¶ 105 (discussing interview conducted by Investigators O'Dea and Kirkpatrick); *id*. at ¶¶ 116-22 (describing deceptive and improper interviews conducted by Sergeant Webster and Investigator O'Dea); *id*. at ¶ 129 (following the investigation by these individuals, Plaintiff was arrested and charged with rape)).  Accordingly, the Court concludes that Plaintiff has plausibly alleged the initiation element of his malicious prosecution claims.  *See, e.g., Andrews v. Johnson*, No. 21-CV-8310 (LTS), 2022 WL 158538, at *5 (S.D.N.Y. Jan. 18, 2022) (where the plaintiff did not allege facts suggesting that detective exerted pressure on prosecutors to bring charges against him, explaining that allegations that detective "fabricated the case against him, destroyed evidence, and lied about a witness may indicate that [the detective] influenced the prosecutors' decision to initiate or continue the criminal proceeding against Plaintiff").

The Court turns next to the probable cause element of a malicious prosecution claim. "A grand jury indictment creates a presumption of probable cause that 'may be rebutted

only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 384 (S.D.N.Y. 2021) (quoting *Manganiello*, 612 F.3d at 162); *see also Savino v. City of N.Y.*, 331 F.3d 63, 72 (2d Cir. 2003) ("under New York law, indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith'" (citation omitted)).   In other words, "[w]here there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment,' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome."  *Manganiello*, 612 F.3d at 162 (quoting *Boyd*, 336 F.3d at 77).   It is "the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment."  *Savino*, 331 F.3d at 73.   "The existence of probable cause is a complete defense to a claim of malicious prosecution in New York."  *Manganiello*, 612 F.3d at 161-62 (alteration and citation omitted).

Plaintiff argues he has alleged facts sufficient to rebut the presumption of probable cause created by the grand jury indictment, citing to the "well-settled *alternative* basis to rebut the presumption," that is, "where 'the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures.'"  (Dkt. 18 at 9 (quoting *Vazquez*, 2014 WL 4388497, at *9)).  "Certain authority suggests that a plaintiff can rebut the presumption of probable cause created by

an indictment by establishing that 'the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures.'" *McClennon v. New York City*, No 13-CV-128(KAM)(SMG), 2018 WL 2943565, at \*16 n.16 (E.D.N.Y. June 11, 2018) (quoting *Harris v. State*, 302 A.D.2d 716, 717 (3d Dep't 2003)); *see also Rhodes v. Tevens*, No. 07-CV-471S, 2012 WL 777421, at \*7 (W.D.N.Y. Mar. 7, 2012) ("Alternatively, the presumption can be overcome by a showing by claimant that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures." (quotations and citations omitted)), *aff'd*, 519 F. App'x 703 (2d Cir. 2013); *Hill v. Melvin*, No. 05 Civ. 6645(AJP), 2006 WL 1749520, at \*13 (S.D.N.Y. June 27, 2006) (same), *aff'd*, 323 F. App'x 61 (2d Cir. 2009).  Plaintiff has not cited, and the Court has not identified, any Second Circuit case specifically adopting this "alternative basis" for rebutting the presumption of probable cause created by a grand jury indictment.  Rather, the Second Circuit has repeatedly, and including recently, held that the "presumption may be rebutted by showing that the indictment 'was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Jones v. City of N.Y.*, 846 F. App'x 22, 24 (2d Cir. 2021) (quoting *Rothstein v. Carriere*, 373 F.3d 275, 283 (2d Cir. 2004)).  Regardless of whether the Second Circuit would adopt this precise language, the Court views this "alternative basis" to be consistent with "other police conduct undertaken in bad faith."

Some of the statements in the complaint, standing alone, amount only to negligence on the part of the WPD officers.  For example, Plaintiff cites to his allegations that the

WPD officers should have made a further inquiry into the allegations against him, and they "made *no effort at all* to investigate the elements of the alleged crime of rape." (*See* Dkt. 18 at 9-13). However, "the police and prosecutors cannot be said to have improperly concealed evidence every time the plaintiff is able to show that they could have done more or could have disclosed more. What is required is proof that the police conduct deviated egregiously from statutory requirements or accepted practices applicable in criminal cases." *King v. City of N.Y.*, No. 12-CV-2344 (NGG)(RER), 2014 WL 4954621, at *5 (E.D.N.Y. Sept. 30, 2014) (quoting *Parisi v. Suffolk Cnty.*, No. 04-CV-2187 (ENV)(ETB), 2009 WL 4405488, at *10 (E.D.N.Y. Nov. 30, 2009)). "Any alleged failure to conduct further investigation or apply all procedures that could have been followed does not amount to fraud, bad faith or the suppression of evidence and is insufficient to overcome the presumption [of probable cause]." *Gil v. Cnty. of Suffolk,* 590 F. Supp. 2d 360, 369-70 (E.D.N.Y. 2008); *see also Williams v. Carpenter*, 214 F. Supp. 3d 197, 201 (W.D.N.Y. 2016) ("Even giving plaintiff's allegations the most generous reasonable construction, he alleges no more than poor police work. That is not enough to support a malicious-prosecution claim, or a § 1983 claim in general."); *Cf. Fox v. Cnty. of Yates,* No. 10-CV-6020, 2010 WL 4616665, at *8 (W.D.N.Y. Nov. 12, 2010) (plaintiff pleaded facts sufficient to overcome presumption where complaint specifically alleged that law enforcement officers had misrepresented overtime procedures to the grand jury, had deliberately withheld an exculpatory electronic recording, and had made false statements to the grand jury regarding a written statement that plaintiff refused to sign).

Putting aside Plaintiff's arguments relating to the sufficiency of the investigation, the Court finds that Plaintiff's allegations relating to additional conduct undertaken by WPD officers at least plausibly allege police conduct undertaken in bad faith sufficient to overcome, at this stage of the proceedings, any presumption created by the grand jury indictment. Plaintiff alleges that the WPD Defendants engaged in oppressive and deceptive investigation techniques. (*See* Dkt. 7 at ¶ 116). He cites specifically to the December 20, 2017 interview conducted by Sergeant Webster, wherein he "twisted Plaintiff's words and alleged in his report that Plaintiff was caught in multiple lies." (*Id*. at ¶ 117). Sergeant Webster failed to capture the audio recording of the interview and, in his report, claimed the recorder malfunctioned despite it being fully functional for all other interviews of Plaintiff. (*Id*. at ¶ 118). Thereafter, Sergeant Webster generated a lengthy, four-page report, which included quotation marks around Plaintiff's alleged statements to make them appear to be verbatim transcriptions of his actual words. (*Id*. at ¶ 119). The report was reviewed and signed by Sergeant Webster's supervisor weeks after the interview occurred, and "was leaked and selectively quoted by the news media to paint Plaintiff in a false light." (*Id*. at ¶¶ 119-20). Plaintiff alleges that "[u]pon information and belief, the WPD Defendants either destroyed the recording after selectively transcribing the interview or it was intentionally not recorded so they could manufacture a narrative to justify their materially deficient investigation." (*Id*. at ¶ 121). In other words, Plaintiff alleges that in the course of the WPD's investigation, they manipulated his interview, prepared a report containing false and misleading information, and "manufactur[ed] a narrative" surrounding the investigation, all of which was presumably forwarded to the District Attorney's Office

for use in Plaintiff's prosecution.  *See, e.g., Jovanovic v. City of N.Y.*, No. 04 Civ. 8437(PAC), 2006 WL 2411541, at *13 (S.D.N.Y. Aug. 17, 2006) (denying motion to dismiss malicious prosecution claim where the plaintiff pleaded that officer "prepared police reports containing false and misleading information about [the plaintiff's] arrest and the evidence collected at [the plaintiff's] apartment, which he then forwarded to prosecutors").

While Plaintiff's complaint is not a model of clarity, his malicious prosecution claims are at least sufficiently pleaded so that these claims may proceed to discovery. When viewed in conjunction with other allegations in the complaint, including the alleged animus of Chief Rieger, Plaintiff's allegations relating to the investigation against him amount to "other police conduct undertaken in bad faith," which is sufficient to overcome the presumption of probable cause created by the grand jury indictment.[2]  Accordingly,

---

[2]     As explained above, the Town Defendants also argue that Plaintiff has failed to allege malice.  (*See* Dkt. 11-1 at 26-28).  "[M]alice does not have to be actual spite or hatred, but means only that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served."  *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (quotation and citation omitted).  "In most cases, the lack of probable cause—while not dispositive—tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause."  *Id*. (quotation and citation omitted).  Here, Plaintiff alleges that Chief Rieger, who directed the investigation, and his daughter were biased and material fact witnesses in the case, Chief Rieger had a close personal relationship with Superintendent Gumina, and Chief Rieger "intensely disliked" Plaintiff due to his coaching style.  Plaintiff further alleges that the WPD—which was "an overwhelmingly white police force with no black police officers"—disliked Plaintiff because "he was a well-liked and accomplished black man having sexual relationships with white women in an overwhelmingly white town."  (*See, e.g.*, Dkt. 7 at ¶ 131).  These allegations, coupled with the Court's finding that Plaintiff has plausibly alleged a lack of probable cause, are sufficient to satisfy the malice element at this stage of the case.

Plaintiff has plausibly alleged claims for malicious prosecution against the Town Defendants.[3]

## 2. Qualified Immunity

The Town Defendants contend that even if the Court finds Plaintiff has stated a claim for malicious prosecution, the individual defendants are entitled to qualified immunity because Plaintiff has failed to plead that the individual defendants did not violate any clearly established law. (Dkt. 11-1 at 28-29).

"A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to

---

[3]     The Town Defendants also argue that the John and Jane Doe Defendants should be dismissed. (Dkt. 11-1 at 32). Specifically, they contend that Plaintiff "has information related to the involvement of various law enforcement agencies," and "cannot merely engage in group pleading and then assert John Doe/Jane Doe defendants involvement, when . . . he went through an entire years long investigation and criminal trial." (*Id.*). It is well-settled that a plaintiff, at the pleading stage, may name unknown John Doe defendants. *See Abreu v. City of N.Y.*, 657 F. Supp. 2d 357, 362-63 (E.D.N.Y. 2009); *see also Davis v. Conn. Corr. Managed Health Care*, No. 3:16-cv-1585 (JAM), 2017 WL 20910, at *3 (D. Conn. Jan. 2, 2017) ("Plaintiff's claims against unnamed 'John Doe' defendants are permissible at this time as placeholders for purposes of notice of the scope of plaintiff's claim and for conducting discovery in this action."); *but see Pizarro v. City of N.Y.*, No. 14-CV-507 (KAM)(VVP), 2015 WL 5719678, at *5 n.5 (E.D.N.Y. Sept. 29, 2015) (dismissing claims against John Doe defendants, where the complaint did not allege "any facts suggesting that Captain John Doe and Police Officers John Does were in any way involved in the initiation of the prosecution").

Here, the complaint specifically references other "agents and/or employees" of the WPD possibly involved in the investigation—which spanned from December 2017 until Plaintiff was arrested and charged on August 30, 2019. (*See* Dkt. 7 at ¶ 93). In other words, Plaintiff has plausibly alleged the possibility that other individuals, in addition to the officers named in the complaint, took part in the lengthy investigation. Given the case is at the pleading stage and before discovery, the Court will not dismiss the John Doe and Jane Doe defendants. However, the Court offers no opinion on whether Plaintiff will be able to timely substitute the Doe defendants at a subsequent stage of the prosecution.

believe that his action did not violate such law." *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (citation omitted).  Although claims of qualified immunity "should be decided as early as possible in a case," it "is often best decided on a motion for summary judgment when the details of the alleged deprivations are more fully developed." *Walker v. Schult*, 717 F.3d 119, 130 (2d Cir. 2013); *see also McKenna v. Wright,* 386 F.3d 432, 435-36 (2d Cir. 2004) (Generally, "the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion for failure to state a claim upon which relief can be granted.") (alteration in original) (quoting *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir. 1983)).  Therefore, "a defendant asserting a qualified immunity defense on a motion to dismiss 'faces a formidable hurdle . . . and is usually not successful.'" *Barnett v. Mt. Vernon Police Dep't,* 523 F. App'x 811, 813 (2d Cir. 2013) (quoting *Field Day, LLC v. Cnty. of Suffolk,* 463 F.3d 167, 191-92 (2d Cir. 2006)).  "The defense will succeed only where entitlement to qualified immunity can be established 'based [solely] on facts appearing on the face of the complaint.'" *Id.* (quoting *McKenna,* 386 F.3d at 436).

Granting the individual defendants qualified immunity is not appropriate at this juncture.  Plaintiff has plausibly alleged constitutional violations by Chief Rieger, Investigator Kirkpatrick, Investigator O'Dea and Sergeant Webster—more specifically, that they took part in a biased investigation against him when they knew there was a conflict of interest and manipulated evidence.  Taking these allegations as true, the Court cannot conclude that the individual defendants' actions did not violate clearly established law, or that it was objectively reasonable for them to believe their actions did not violate clearly established law. *See Jackson v. New York State,* 381 F. Supp. 2d 80, 91 (N.D.N.Y. 2005)

("Plaintiff alleges violations of her constitutional rights and, based on the complaint alone, it does not appear that defendants' actions were objectively reasonable. Further factual information is necessary, therefore, to determine whether defendants are entitled to qualified immunity."); *see also Bailey*, 79 F. Supp. 3d at 458 ("No defendant officer is entitled to qualified immunity when alleged fabrication of evidence is key to the case."). Accordingly, the individual defendants are not entitled to qualified immunity at this juncture.

### 3. *Monell* Liability

The Town Defendants further argue that Plaintiff has failed to plausibly allege a claim for *Monell* liability because he makes only general, conclusory statements regarding the "policy" of the Town of Webster that was the cause of the alleged malicious prosecution. (Dkt. 11-1 at 29-31).

Although Plaintiff's ninth cause of action purports to be a claim for "*Monell* Liability" (*see* Dkt. 7 at 34), "*Monell* does not provide an independent separate cause of action against a municipality; 'it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation,'" *Gem Fin. Serv., Inc. v. City of N.Y.*, 298 F. Supp. 3d 464, 490 (E.D.N.Y. 2018) (quoting *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006)). In other words, *Monell* is not a cause of action, but is rather a form of liability. As explained above, the WPD has been dismissed from this action, and therefore the Court considers whether the allegations in the complaint provide a basis for extending liability for the alleged constitutional violations to the Town of Webster.

"[T]o establish municipal liability under § 1983, a plaintiff must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)). "[T]o hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to . . . prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983). Official municipal policy includes "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61. To survive a motion to dismiss, the plaintiff "cannot merely allege the existence of a municipal policy or custom, but must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Triano v. Town of Harrison, N.Y.*, 895 F. Supp. 2d 526, 535 (S.D.N.Y. 2012) (quotations and citation omitted). A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of N.Y.*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (citations omitted). "[E]ven a single action by a [final policymaker] . . . is sufficient to implicate the

municipality in the constitutional deprivation for the purposes of § 1983." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)

Viewing Plaintiff's allegations in the light most favorable to him, Plaintiff has plausibly alleged *Monell* liability against the Town of Webster, at least at this stage of the proceedings. Specifically, Plaintiff has identified actions taken by a government official responsible for establishing the municipal policies—that is, Chief Rieger—that caused the particular deprivation in question. (*See, e.g.*, Dkt. 7 at ¶ 225 (Chief Rieger, as the chief executive officer[] . . .of the . . . WPD, [is] [a] final policy maker[].")); *see also id*. at ¶¶ 93-99 (alleging that Chief Rieger directed investigation against Plaintiff, despite having conflict of interest)); *see also Ocasio v. City of Canandaigua*, 513 F. Supp. 3d 310, 325 (W.D.N.Y. 2021) ("Plaintiffs have plausibly alleged that Hedworth, as the Police Chief for the City, was a final policymaker for purposes of the relevant events")). Accordingly, Plaintiff's claim against the Town of Webster may proceed at this stage of the case.

## C. The School District Defendants

Plaintiff asserts against the School District Defendants the following causes of action: malicious prosecution under New York law; malicious prosecution in violation of 42 U.S.C. § 1983; gender discrimination against the WCSD; equal protection; race discrimination; intentional infliction of emotional distress; *prima facie* tort; and *Monell* liability against the WCSD.[4] (*See* Dkt. 7).

---

[4] As explained above at section II(B) of this Decision and Order, Plaintiff's official capacity claims and his claim for punitive damages are also dismissed as to the School District Defendants.

### 1. Malicious Prosecution Claims

The School District Defendants argue that Plaintiff's malicious prosecution claims must be dismissed because he does not allege facts showing they initiated criminal proceedings against him, and rather the WPD is the subject of each of Plaintiff's allegations concerning the prosecution. (Dkt. 9-4 at 17-19). They further argue that Plaintiff has not alleged facts establishing a lack of probable cause. (*Id*. at 19). The School District Defendants also contend that Plaintiff has failed to allege they acted with actual malice. (*Id*. at 20). Finally, they contend that Plaintiff has not alleged he suffered the requisite deprivation of a liberty interest sufficient to support a constitutional violation. (*Id*. at 21).

As referenced above, "[w]hile malicious prosecution claims are generally brought against arresting or prosecuting officials, 'they can also be brought against individuals other than the arresting officer when such a person actively engaged in a plaintiff's prosecution.'" *Bornschein v. Herman*, 304 F. Supp. 3d 296, 302 (N.D.N.Y. 2018) (citation omitted). However, "a defendant must do more than report a crime or give testimony." *Manganiello*, 612 F.3d at 163. "It is well settled in this State's jurisprudence that a civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest or malicious prosecution." *Du Chateau v. Metro-North Commuter R.R. Co.,* 253 A.D.2d 128, 131 (1st Dep't 1999). However, "[g]iving information to the police that is known to be false qualifies as the commencement of a prosecution." *Bornschein*, 304 F. Supp. 3d at 302 (citation omitted). As explained by the Second Circuit in *Vlach v. Staiano*:

A private defendant must have taken an active role in the prosecution, "such as giving advice and encouragement or importuning the authorities to act," to be found to have initiated a criminal prosecution as required for liability to attach.   Merely "reporting a crime to law enforcement and giving testimony" does not suffice.   Viewing the record in the light most favorable to Vlach, we discern no evidence from which a reasonable jury could find that Staiano initiated or took an active role in Vlach's actual prosecution.   When a "criminal charge is the culmination of a lengthy investigation involving various sources of evidence, the mere fact that a witness provided false information to the government"—as Vlach asserts Staiano did here—"does not warrant a conclusion that the witness initiated the prosecution where the rest of the evidence suggests otherwise."

604 F. App'x 77, 79 (2d Cir. 2015) (internal citations omitted); *see also LoPorto v. Cnty. of Rensselaer*, No. 1:15-CV-0866 (LEK/DJS), 2018 WL 4565768, at *9 (N.D.N.Y. Sept. 24, 2018) (explaining that the plaintiff did not state claim for malicious prosecution, where the complaint did not allege that individuals initiated or played any role in the criminal investigation and proceedings against him); *Bornschein*, 304 F. Supp. 3d at 302 ("Although [plaintiff] alleges that [his neighbor] urged [officer] to press criminal charges . . . that is not enough to show [the neighbor] played an active role in the prosecution.").

In support of his malicious prosecution claim against the School District Defendants, Plaintiff alleges they created a "circus-like atmosphere" which emboldened the accuser to falsely accuse Plaintiff of rape.  (Dkt. 7 at ¶ 87).  After Plaintiff was arrested, Superintendent Gumina told faculty members not to communicate with Plaintiff, his attorneys, or his investigators about the case (*id.* at ¶ 134), and Principal Benz approached another faculty member and asked how he "was doing with all of this" and repeated the phrase "gotta be careful" numerous times (*id.* at ¶ 136).  Another colleague's coaching position was threatened, and she was told to "lose Watkin's number."  (*Id.* at ¶ 137).

Plaintiff's complaint is devoid of any allegation concerning any interaction between the School District Defendants and the WPD.  For example, Plaintiff has not alleged that the School District Defendants gave advice to the WPD relating to Plaintiff's prosecution, encouraged the WPD to arrest or prosecute Plaintiff, or otherwise gave the WPD information importuning them to arrest Plaintiff for rape.  Nor does the complaint allege that the School District Defendants made a false rape report to law enforcement, gave false testimony relating to any alleged rape, or instructed the victim to make a false rape report.  Rather, as Plaintiff alleges in his complaint, the WPD began investigating Plaintiff based on the accuser's statement that she was raped.  (*Id*. at ¶¶ 92-93 (alleging that the WPD began investigating Plaintiff after she acknowledged her allegations to school administrators and her father)).  In his response papers, Plaintiff points to his allegation that Superintendent Gumina had a "very close personal relationship" with Chief Rieger (*see* Dkt. 19 at 12-13), but that allegation falls far short of plausibly alleging that the School District Defendants took an active role in Plaintiff's prosecution, and Plaintiff himself characterizes any such connection as "speculative" (*see id*. at 13 ("it is not implausible to speculate that the District worked closely with the police department to maliciously investigate this case")).  However, a complaint is not a fishing expedition, and speculative and conclusory allegations will not survive a motion to dismiss.

Plaintiff argues that the School District Defendants were actively involved in the prosecution of Plaintiff based on his allegations that they created an "atmosphere" which emboldened the accuser to make a false rape allegation.  Plaintiff has not offered, nor has the Court identified, any case law suggesting that the creation of an "atmosphere" would

amount to playing an "active role" in the prosecution to satisfy the initiation element, and any such allegation that the "atmosphere" at WCSD somehow constituted the "initiation" of criminal proceedings would seem to be far too attenuated.  The Court has also considered Plaintiff's allegations relating to the meeting called by the School District Defendants, where faculty members were allegedly instructed not to speak with Plaintiff or his attorneys, as well as their approaching two individual faculty members about Plaintiff. Again, even taking these actions are true, they do not rise to the level of the School District Defendants taking an "active role in the prosecution, 'such as giving advice and encouragement or importuning the authorities to act,' to be found to have initiated a criminal prosecution as required for liability to attach."  *Vlach*, 604 F. App'x at 79. Accordingly, because Plaintiff has failed to plausibly allege that the School District Defendants initiated criminal proceedings against him, his malicious prosecution claims against those defendants are dismissed.[5]

### 2. Title IX Claim

Plaintiff's fourth cause of action is for gender discrimination in violation of Title IX.  (*See* Dkt. 7 at 28).  The School District Defendants contend that Plaintiff's Title IX claim must be dismissed because Title VII is the proper remedy for employment

---

[5]   The School District Defendants also request that, in the event the Court permitted Plaintiff's malicious prosecution claims against them to proceed, the claims relating to Plaintiff's employment be severed from the claims relating to Plaintiff's prosecution, as they are entirely independent.  (*See* Dkt. 9-4 at 40).  Because the Court has determined that Plaintiff's malicious prosecution claims must be dismissed as to the School District Defendants, the request to sever is moot.

discrimination claims, and the majority of district courts in the Second Circuit have found that an implied private right of action does not exist under Title IX for employees alleging gender discrimination.[6]  (Dkt. 9-4 at 34).  Further, they argue that Plaintiff has failed to establish any action taken by the WCSD based on Plaintiff's gender, and the Second Circuit, in *DeCintio v. Westchester Cnty. Med. Ctr.*, 807 F.2d 304 (2d Cir. 1986), has "specifically held that under Title VII disparate treatment premised not on one's gender but rather on a romantic relationship does not constitute discrimination on the basis of sex." (*Id*. at 34-35).  Finally, the School District Defendants contend that Plaintiff fails to show disparate treatment because he does not allege that he is similarly situated "in all material respects."  (*Id*. at 36).

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"  20 U.S.C. § 1681(a).  The Second Circuit has not squarely addressed whether there is a private right of action for employment discrimination under Title IX.  *See Gagliardi v. Sacred Heart Univ.*, 855 F. App'x 1, 3 n.2 (2d Cir. 2021); *Summa v. Hofstra Univ.*, 708 F.3d 115, 131-32 (2d Cir. 2013).  While "[a]n overwhelming majority of district courts in this Circuit have found that an implied private right of action *does not* exist under Title IX for employees alleging gender discrimination in the terms and conditions of their

---

[6]     Plaintiff has not brought a Title VII discrimination claim, presumably because he did not file a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) or the New York Division of Human Rights (NYDHR).

employment," *Gayle v. Children's Aid Coll. Prep Sch.*, No. 18 Civ. 9874 (GBD), 2019 WL 3759097, at \*5 (S.D.N.Y. July 29, 2019), some district courts have recognized such a cause of action, *see Hauff v. State Univ. of N.Y.*, 425 F. Supp. 3d 116, 131 (E.D.N.Y. 2019) ("This Court's analysis of the foregoing cases supports an implied cause of action under Title IX for employees of educational institutions receiving federal funding and that such a cause of action is not displaced by Title VII.").  At oral argument, defense counsel notified the Court of another case, *Piscitelli v. Univ. of St. Joseph*, No. 3:19-CV-01589, 2020 WL 3316413 (D. Conn. June 18, 2020), where the court concluded, following a lengthy analysis of the issue, that there is no private right of action for employment discrimination claims under Title IX.  *Id.* at \*12.  Plaintiff argues that because the Second Circuit "has deliberately left open the possibility and several district courts have recently found a private right of action, this Court should do the same."  (Dkt. 19 at 21).  He further argues that because the Title IX claim arises out of the same nucleus of operative facts as the other discrimination claims, the Court should exercise its discretion and wait until the close of discovery to address it.  (*Id.*).

Several circuit courts have considered whether a private right of action exists under Title IX for employees alleging gender discrimination, and there is presently a circuit split on this issue.  *See Summa*, 708 F.3d at 131 n.1 (explaining that while the First and Fourth Circuits have recognized a private right of action for employment discrimination claims under Title IX, the Fifth Circuit has held that Tile VII provides exclusive remedy for individuals alleging gender-based employment discrimination); *see also Xanthakos v. City Univ. of N.Y.*, No.  17-CV-9829, 2020 WL 5026930, at \*9 n.15 (S.D.N.Y. Aug. 24, 2020)

(recognizing that "[t]he First, Third, Fourth, and Sixth Circuits have held that employment discrimination claims are actionable under Title IX, while the Fifth and Seventh Circuits have held that they are not," and comparing *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 563 (3d Cir. 2017) (recognizing claim), *Ivan v. Kent St. Univ.*, 92 F.3d 1185, 1996 WL 422496, at *2 n.10 (6th Cir. 1996) (same), *Preston v. Commonwealth of Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206-07 (4th Cir. 1994) (same), *and Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 896-97 (1st Cir. 1988) (same), *with Waid v. Merrill Area Pub. Sch.*, 91 F.3d 857, 862 (7th Cir. 1996) (rejecting claim), *and Lakosi v. James*, 66 F.3d 751, 754 (5th Cir. 1995) (same)).

Having reviewed the aforementioned authority, and considering the purposes of Title VII, the Court joins the majority of district courts in New York in concluding that there is no private right of action under Title IX.  *Gayle*, 2019 WL 3759097, at *5; *see also Xanthakos*, 2020 WL 5026930, at *9 (discussing "overwhelming majority" of district courts, and agreeing that "Title VII is the exclusive remedy for employees alleging employment discrimination on the basis of sex"); *Philpott v. New York*, 252 F. Supp. 3d 313, 319 (S.D.N.Y. 2017) ("I join many other courts in this district and hold that employment discrimination claims are not actionable under Title IX.").  This is because "Title IX was not intended to enable employees of educational institutions complaining of gender discrimination to bypass the remedial scheme Congress established in Title VII." *Urie v. Yale Univ.*, 331 F. Supp. 2d 94, 97-98 (D. Conn. 2004).  The Court finds particularly persuasive the reasoning by the Fifth Circuit that recognizing an implied private right of action for damages under Title IX for employment discrimination "would disrupt a

carefully balanced remedial scheme for redressing employment discrimination by employers." *Lakoski*, 66 F.3d at 754; *Xanthakos*, 2020 WL 5026930, at \*9 (noting that "[a]n implied right of action under Title IX would disrupt the balanced remedial scheme of Title VII," which requires exhaustion of administrative remedies). In other words, the Court does not believe that Congress intended to allow plaintiffs who missed the specific deadlines mandated by Title VII to use Title IX to create an end run around the statute. Accordingly, the Court dismisses Plaintiff's Title IX claim, and does not reach the other arguments raised by the School District Defendants in support of dismissing this claim.

### 3. Equal Protection Claim

Plaintiff brings his fifth cause of action pursuant to Section 1983, for violation of the Equal Protection Clause for differential treatment he experienced based on his race and gender. (Dkt. 7 at 29). The School District Defendants argue that Plaintiff's equal protection claim must be dismissed because he has failed to identify any similarly situated individuals to himself to establish differential treatment (that is, other individuals accused of "grooming" a student), nor can he allege that his race or gender were the "but-for" cause of his termination, as is required for a Section 1983 equal protection claim, and his allegations of personal animus undercut his allegations of discrimination. (Dkt. 9-4 at 26-28). The School District Defendants also argue that, for Plaintiff's claims brought pursuant to Section 1983, they must be dismissed against the individual defendants because Plaintiff has engaged in "group pleading," and he does not sufficiently allege their personal involvement. (*Id*. at 15; Dkt. 22 at 7-8).

"The Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).  "To state a claim for a violation of his right to equal protection, Plaintiff must allege that, (1) compared with others similarly situated, plaintiff was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Milfort v. Prevete*, 922 F. Supp. 2d 398, 410 (E.D.N.Y. 2013) (citation omitted); *see also Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004) (same).

In support of his claim, Plaintiff contends that "[a]n Equal Protection claim can be established where there exist 'mixed motives' for the challenged government conduct," (Dkt. 19 at 16 (quoting *Raza v. City of N.Y.*, 998 F. Supp. 2d 70, 79 (E.D.N.Y. 2013)), and therefore the fact that he also alleges personal animus does not undercut his discrimination claims.  The School District Defendants dispute Plaintiff's interpretation of the law on this issue, citing to *Naumovski v. Norris*, 934 F.3d 200 (2d Cir. 2019), where the Second Circuit held that "a plaintiff pursuing a claim for employment discrimination under § 1983 rather than Title VII must establish that the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action or the hostile environment." *Id*. at 214; *see also James v. John Jay Coll.*, No. 19cv644 (DLC), 2020 WL 1911211, at *6 (S.D.N.Y. Apr. 20, 2020) (explaining that "in the employment context, the defendant must have acted with discriminatory intent and that intent must have been a 'but-for' cause of the adverse employment action or the hostile environment," and "[d]ismissal is appropriate where a

causal connection is not alleged or reasonably inferred from the complaint" (quotations and citation omitted)).  At oral argument, Plaintiff conceded that the "but-for" causation standard is the correct standard to apply in the Section 1983 context, but argued that standard does not require a defendant's actions to "entirely" relate to the protected classification.  As the Supreme Court has explained, the "but-for" standard requires that the Plaintiff show "that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct."  *Naumovski*, 934 F.3d at 213 (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346-47 (2013)).

In their reply papers and at oral argument, the School District Defendants frame Plaintiff's equal protection claim as a "class-of-one" claim, arguing that a plaintiff may not bring any such claim against a public employer.  (*See, e.g.*, Dkt. 22 at 11).  "The 'class-of-one' theory holds that 'the Equal Protection Clause forbids public employers from irrationally treating one employee differently from others similarly situated, regardless of whether the different treatment is based on the employee's membership in a particular class.'"  *Conyers v.  Rossides*, 558 F.3d 137, 151-52 (2d Cir. 2009) (citation omitted).  In *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591 (2008), the Supreme Court found that such claims were "simply a poor fit in the public employment context," because they are "simply contrary to the concept of at-will employment."  *Id*. at 605-06.  However, as further explained below, Plaintiff has alleged membership in a particular class (*see, e.g.*, Dkt. 7 at ¶ 187 (in connection with Plaintiff's Equal Protection claim, alleging that he was "intentionally and willfully investigated, suspended, terminated, and otherwise disciplined

Plaintiff based on his race and gender")), and therefore his equal protection claim is not based on the "class-of-one" theory.

While Plaintiff alleges he was targeted by the School District Defendants for personal reasons relating to consensual relationships he engaged in, he also alleges that he experienced unfair treatment based on his race and gender; in other words, because he was a black man having sexual relationships with white women, in an overwhelmingly white town.  For example, Plaintiff alleges he was the only black teacher in the WCSD (*id*. at ¶ 41), that according to the 2019 census, the Town of Webster is 91.9 percent white and two percent black (*id*. at ¶ 42), and also that Superintendent Gumina told Plaintiff in 2017, at a school even about racism, that white privilege does not exist, and that "things are not like that in Webster" (*id*. at ¶ 48).  Plaintiff argues that he was singled out and disciplined for engaging in conduct—such as having intimate personal relationships with other faculty members at the school, giving away free apparel to students, and for having supportive relationships with students—for which his white colleagues were not punished (Dkt. 19 at 18; *see also* Dkt. 7 at ¶¶ 64, 83-84), and for which he was ultimately fired.  Although the School District Defendants argue that Plaintiff was investigated and terminated not because of his race or gender, but because he had an inappropriate "grooming" relationship with a student, Plaintiff alleges that both he and the student denied any such relationship existed. In other words, Plaintiff has plausibly alleged that because he was a black male, he was subject to fabricated grooming allegations, an investigation, and termination based on consensual intimate relationships he had with other faculty members, and white faculty

members who engaged in the same conduct, including Superintendent Gumina, were not disciplined.

The Court next must examine the personal involvement of each individual School District defendant.  "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven,* 720 F.3d 133, 138 (2d Cir. 2013).  "A defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority. Rather, the personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (alterations, quotations, and citations omitted).  Although in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), the Second Circuit identified five categories of evidence that may establish the liability of a supervisory official, more recently, in *Tangreti v. Bachmann*, the Second Circuit clarified that "there is no special rule for supervisory liability.  Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  983 F.3d 609, 618 (2d Cir. 2020).  The Second Circuit explained further that "[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary," and "[t]he violation must be established against the supervisory official directly."  *Id.* (second alteration in original) (quotations and citations omitted).

In their reply papers, the School District Defendants provide a chart which, as it pertains to Plaintiff's Equal Protection claim, lists the paragraphs in the complaint containing specific factual allegations against each individual defendant. (Dkt. 22 at 7-8). While the chart identifies certain allegations against Superintendent Gumina, Reusch, and Exner, the chart says "NONE" as to Principal Benz and AP Goodwine. (*Id.*).

Having carefully reviewed the complaint, the Court concludes that Plaintiff has adequately alleged Superintendent Gumina's personal involvement. Plaintiff alleges that Superintendent Gumina launched an investigation against him, and ultimately fired him, for conduct—such as engaging in consensual romantic relationships—for which other white faculty members, including Superintendent Gumina himself, were not disciplined. (*See* Dkt. 7 at ¶¶ 63-64). He alleges that Superintendent Gumina was present at the November 2017 meeting where he was informed he was under investigation, and also told Plaintiff that "gifts are not right," despite that they were given to everyone, and also referred to Plaintiff's "pattern" of consensual relationships with female faculty members. (*Id.* at ¶¶ 55-60, 63). Likewise, Plaintiff alleges that Exner and Reusch were the individuals who initially orchestrated the grooming allegations against him, including by meeting with the purported victim, who denied there was any inappropriate conduct, asked her if she knew she was being "groomed" and showed her the dictionary definition of that term. (*Id.* at ¶¶ 69-77). Plaintiff's allegations against Principal Benz and AP Goodwine are less detailed—more specifically, Plaintiff alleges that the WCSD, through Superintendent Gumina, Principal Benz, and AP Goodwine, hired a private investigator to follow and spy on Plaintiff. (*Id.* at ¶¶ 65-67). Although Plaintiff alleges that Principal Benz and AP

Goodwine acted with the WCSD and Superintendent Gumina, the Court finds that the specific allegation—that they participated in hiring a private investigator to follow and spy on Plaintiff—to be sufficient, at least as this stage of the litigation, to plausibly allege their personal involvement. *See Brantley v. Fischer*, No. 9:12-CV-1051 (NAM/RFT), 2013 WL 5466790, at *11 (N.D.N.Y. Sept. 30, 2013) ("Construing all evidence in Plaintiff's favor, at this early stage such an allegation is sufficient to plausibly allege [personal involvement]."); *Cf. Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (dismissing claim against superintendent, where there were no allegations that he engaged directed in any discriminatory conduct). Whether Plaintiff can provide evidence supporting his claim that Principal Benz and AP Goodwine were involved in violations of his right to equal protection remains to be seen but, at this stage of the litigation, his claim against them may proceed to discovery.

### 4. Plaintiff's Sixth Cause of Action Pursuant to Sections 1981 and 1983

Plaintiff's sixth cause of action is for race discrimination, pursuant to 42 U.S.C. §§ 1981 and 1983. (Dkt. 7 at 30). The School District Defendants contend this claim must be dismissed because Plaintiff has failed to plead a causal connection between any alleged discrimination and the School District Defendants. (Dkt. 9-4 at 28-29).

As an initial matter, and although neither party has addressed it, the Court notes that 42 U.S.C. § 1981 "does not provide a separate private right of action against state actors." *Duplan v. City of N.Y.*, 888 F.3d 612, 620-21 (2d Cir. 2018) (explaining that "[b]ecause § 1983 already provides a remedy against state actors, there is no reason to infer from the rights-conferring language of § 1981(c) that it creates an additional, and duplicative,

remedy"); *see also Smalls v. Collins*, 10 F.4th 117, 130, 144-45 (2d Cir. 2021) (declining to revisit the court's "binding precedent" in *Duplan*).  Accordingly, to the extent Plaintiff's sixth cause of action is brought pursuant to § 1981, it is dismissed.

Plaintiff's sixth cause of action for race discrimination, which is brought pursuant to Section 1983, is no different than his Equal Protection claim, which is also based on alleged discrimination due to his race.  In other words, Plaintiff's right not to be discriminated against based on his race stems from the Equal Protection guarantee in the Fourteenth Amendment, whereas Section 1983 merely provides the mechanism by which Plaintiff may bring his constitutional claims in federal court.  *See, e.g., Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87-88 (2d Cir. 2015) (discussing the plaintiff's equal protection claim, brought pursuant to Section 1983, as opposed to Title VII claim).  At oral argument on January 31, 2022, Plaintiff agreed there is no difference between his fifth and sixth causes of action, and the Court is not able to discern any real distinction between those claims.  Accordingly, Plaintiff's sixth cause of action for race discrimination is dismissed as duplicative of his fifth cause of action for violation of his right to equal protection under the law which, as explained above, may proceed at this juncture.

### 5.  Qualified Immunity

The School District Defendants argue that, even if Plaintiff has alleged a constitutional violation, the individual defendants are entitled to qualified immunity because they did not violate Plaintiff's clearly established statutory or constitutional rights, nor would a reasonable actor have been on notice that his or her actions constituted a constitutional violation.  (Dkt. 9-4 at 33).  They further argue that their actions were not

objectively unreasonable, and reasonable officials could disagree whether or not their actions were reasonable. (*Id.*).

The Court previously explained above in Section II(B)(2), *supra*, the standard for granting qualified immunity on a motion to dismiss—and it will not repeat it here—but reiterates that "a defendant asserting a qualified immunity defense on a motion to dismiss 'faces a formidable hurdle . . . and is usually not successful.'" *Barnett*, 523 F. App'x at 813 (citation omitted). Taking the allegations in the complaint as true—which the Court is obligated to do at this stage of the case—the Court concludes that granting the individual School District Defendants qualified immunity is not appropriate at this stage of the case. Plaintiff has plausibly alleged constitutional violations by Superintendent Gumina, Principal Benz, AP Goodwine, Reusch, and Exner—more specifically, that he was treated differently than white faculty members who, like himself, engaged in intimate relationships with other faculty members, including that he was subject to false grooming allegations, an investigation, and his ultimate termination, which was motivated by race-based animus. Taking these allegations as true, the Court cannot conclude that the individual defendants' actions did not violate clearly established law, or that it was objectively reasonable for them to believe their actions did not violate clearly established law. *See, e.g., Barrella v. Vill. of Freeport*, 43 F. Supp. 3d 136, 182 (E.D.N.Y. 2014) (qualified immunity not appropriate because "the law is well-settled that intentional discrimination is illegal"), *aff'd*, 814 F.3d 594 (2d Cir. 2016). Accordingly, the individual School District Defendants are not entitled to qualified immunity at this juncture.

### 6. *Monell* Liability

The School District Defendants next argue that Plaintiff's *Monell* claim fails because he "does not allege the existence of an actual policy, nor facts regarding other alleged constitutional violations sufficient to support a claim based upon a custom or practice." (Dkt. 9-4 at 30-31). They also argue that the "conclusory allegation that Superintendent Gumina acted as the final policymaker without any supporting facts is insufficient to establish liability against the District under § 1983 for alleged injuries to Plaintiff inflicted by its employees." (*Id*. at 31).

"A school district's liability under *Monell* may be premised on any of three theories: (1) that a district employee was acting pursuant to an expressly adopted official policy; (2) that a district employee was acting pursuant to a longstanding practice or custom; or (3) that a district employee was acting as a 'final policymaker.'" *Hurdle v. Bd. of Educ. of City of N.Y.*, 113 F. App'x 423, 424-25 (2d Cir. 2004) (citation omitted).

The Court disagrees that Plaintiff's allegations relating to Superintendent Gumina are conclusory. Plaintiff alleges that Gumina, who was the Superintendent of WCSD and was therefore a "final policy maker" (*see* Dkt. 7 at ¶ 225), directed an investigation against Plaintiff, which was motivated by improper animus. The complaint contains factual statements supporting Superintendent Gumina's policymaking authority, including his ability to call meetings relating to Plaintiff's suspension and his ability terminate Plaintiff's employment. (*Id*. at ¶¶ 79, 85-86 (alleging that Superintendent Gumina stated that he did not intend to bring Plaintiff back from administrative leave, he stated in a letter that he

intended to terminate Plaintiff at a board meeting, and Plaintiff was terminated at the board meeting)).

The School District Defendants argue that the identification of policymaking officials is a question of state law and under New York law, the Board of Education appoints all school district staff and therefore has formal policymaking authority—not the superintendent. (*See* Dkt. 9-4 at 31); *see also Hurdle*, 113 F. App'x at 425 ("whether a particular official has final policymaking authority is a question of *state law*" (citation omitted)). However, the allegations in the complaint suggest that Superintendent Gumina wanted to fire Plaintiff and then directed the Board of Education to fire Plaintiff at a Board meeting. "In terms of municipal liability, when a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policy making authority. One means of doing so . . . is to establish that a policymaker ordered or ratified the subordinates' actions." *See Davis v. Luft*, No. 5:16-CV-1337 (TJM/ATB), 2019 WL 5883698, at *2 (N.D.N.Y. Nov. 12, 2019) (citation and quotations omitted); *see also Nagle v. Marron*, 663 F.3d 100, 116-17 (2d Cir. 2011) (remanding case to district court on question of school district's liability, as superintendent "may himself be deemed the final decisionmaker with respect to personnel appointments, because his recommendations are essentially those of the governmental body" (quotations and citation omitted)). Accordingly, the School District Defendants may not avoid municipal liability at this stage of the litigation, and Plaintiff is entitled to discovery on

whether Superintendent Gumina acted as a final policymaker for purposes of terminating Plaintiff's employment.

### 7.  Remaining State Law Claims

The School District Defendants argue that Plaintiff's state law claims against the individual defendants must be dismissed because they are barred by the one-year statute of limitations.  (*See* Dkt. 9-4 at 37); *see also* N.Y. C.P.L.R. 215.  In response, Plaintiff contends that "[o]n March 20, 2020, in response to the Covid-19 pandemic, Governor Cuomo issued Executive Order 202.8," which "was subsequently renewed multiple times. By its terms the Executive Order purported to toll any specific time limit for the commencement, filing, or service of any legal action."  (*See* Dkt. 19 at 26 (quoting *Wilson v. Town of Ulster*, 1:20-CV-104 (TJM/DJS), 2021 WL 1946485, at *3 (N.D.N.Y. May 14, 2021) (quotations and citations omitted))).  The Executive Order tolled the statute of limitations from March 2020 through November 2020.  *Freeman v. Jacobson*, No. 20-CV-10040(SN), 2021 WL 3604754, at *6 (S.D.N.Y. Aug. 13, 2021).  Because the Court has already dismissed Plaintiff's state law malicious prosecution claims against the School District Defendants, the Court turns to Plaintiff's remaining state law claims: his claim for intentional infliction of emotional distress and his claim for *prima facie* tort.

### a.  Intentional Infliction of Emotional Distress ("IIED")

At oral argument on January 31, 2022, Plaintiff conceded that his IIED claim should be dismissed because it is untimely.  The statute of limitations for IIED claims is one year under New York law.  *See* C.P.L.R. § 215; *see also Forbes v. Merrill Lynch, Fenner & Smith, Inc.*, 957 F. Supp. 450, 455 (S.D.N.Y. 1997) ("It is well established under New York

law that a claim of intentional infliction of emotional distress has a one-year statute of limitations." (citation omitted)).  Plaintiff was no longer employed by the WCSD after he was terminated at a board meeting on December 27, 2017.  (Dkt. 7 at ¶¶ 85-86).  According to Plaintiff's complaint, the last action attributable to defendants Reusch and Exner occurred in or around November 2017, when they allegedly took part in manufacturing the grooming allegations against Plaintiff.  (*Id*. at ¶¶ 55, 68-76).  Likewise, according to the complaint, the last actions attributable to Superintendent Gumina, Principal Benz, and AP Goodwine occurred no later than February 15, 2019.  (*Id*. at ¶¶ 132-39).  Accordingly, the one-year statute of limitations for the above-mentioned conduct expired in 2018 for defendants Reusch and Exner, and in February 2020 for Superintendent Gumina, Principal Benz, and AP Goodwine, both of which were prior to the implementation of the Executive Order in March 2020.  In other words, the Executive Order did not operate to toll either of these limitations periods.  Because it is untimely, Plaintiff's IIED claim is dismissed.

### b. *Prima Facie* Tort

At oral argument, the School District Defendants argued that Plaintiff's *prima facie* tort claims also are subject to a one-year statute of limitations.  In their motion papers, while recognizing that New York courts differ as to whether there is a one-year or three-year statute of limitations for a *prima facie* tort claim, they argue that Plaintiff's *prima facie* tort claim stems from the conduct underlying his malicious prosecution and IIED claims, and he cannot use his *prima facie* tort claim to circumvent the statute of limitations for those claims.  (Dkt. 9-4 at 38).

Where economic loss is sought, the three-year statute of limitations applies.  *See Riddell Sports Inc. v. Brooks*, 872 F. Supp. 73, 75-76 (S.D.N.Y. 1995) ("Under New York law, when recompense for economic loss is sought rather than damages for reputational injury," the statute of limitations for *prima facie* tort is "governed by the three year limitations period set forth in section 214 of the Civil Practice Laws and Rules").  Plaintiff has alleged he suffered economic loss, including legal fees and damages from lost earnings. (*See* Dkt. 7 at ¶¶ 151, 221).   Accordingly, the three-year statute of limitations applies, and Plaintiff's *prima facie* tort claim appears to be timely.

The School District Defendants argue that Plaintiff's *prima facie* tort claim must be dismissed because he fails to plead the elements of a *prima facie* tort claim, including that he has failed to plead malice as the sole motivation, or that the School District Defendants acted without excuse or justification.  (Dkt. 9-4 at 38; Dkt. 22 at 21-22).  Plaintiff contends that there is no particularity requirement for pleading scienter for non-fraud-based claims, and "further discovery will shed light on whether Defendants were motivated by malice." (Dkt. 19 at 27).

*Prima facie* tort is a "cause of action that is highly disfavored in New York."  *Nevin v. Citibank, N.A.*, 107 F. Supp. 2d 333, 347 (S.D.N.Y. 2000).   "The four elements for a *prima facie* tort in New York State are: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, and (4) by an act or series of acts that would otherwise be lawful."  *Katz v. Travelers*, 241 F. Supp. 3d 397, 405 (E.D.N.Y. 2017).  "The touchstone is 'disinterested malevolence', meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm," and

- 53 -

therefore "motives other than disinterested malevolence, 'such as profit, self-interest, or business advantage' will defeat a prima facie tort claim." *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990) (citations omitted).

"A critical element of the prima facie tort cause of action is that plaintiff suffered specific and measurable loss, which requires an allegation of special damages." *Harisch v. Goldberg*, No. 14-cv-9503 (KBF), 2016 WL 1181711, at *13 (S.D.N.Y. Mar. 25, 2016) (alteration omitted) (quoting *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143 (1985)). "'Special damages' is defined as a 'specific and measurable loss,' . . . and must be alleged with sufficient particularity to identify actual [losses] and be related causally to the alleged tortious acts." *Levantino v. Skala*, 56 F. Supp. 3d 191, 206 (E.D.N.Y. 2014) (alteration in original) (citation omitted); *see also Harisch*, 2016 WL 1181711, at *13 ("Under New York law, special damages must be pled with particularity." (citation omitted)); *John and Vincent Arduini Inc. v. NYNEX*, 129 F. Supp. 2d 162, 174 (N.D.N.Y. 2001) (explaining that "the purpose of the special damages pleading requirement is to put Plaintiff on notice as to the exact losses claimed").

Finally, "a set of facts giving rise to a common-law tort is fatal to a prima facie tort claim . . . for once a traditional tort is established the cause of action for prima facie tort disappears." *Chen v. United States*, 854 F.2d 622, 628 (2d Cir. 1988) (quotations and citation omitted).[7]

---

[7]     "While prima facie tort may be pleaded in the alternative with a traditional tort, once a traditional tort is established the cause of action for prima facie tort disappears." *Curiano v. Suozzi*, 63 N.Y.2d 113, 117 (1984); *see also Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143 (1985) (explaining that "[w]here relief may be afforded under traditional tort concepts,

The Court finds that Plaintiff has failed to adequately allege a *prima facie* tort claim. While Plaintiff has arguably alleged that the actions by Superintendent Gumina, Reusch, and Exner were taken with the sole intent to harm, he has failed to plead disinterested malevolence on the part of Principal Benz or AP Goodwine.  More significantly, the claim must be dismissed as to all defendants because Plaintiff has failed to adequately plead special damages—in fact, he has not alleged any specific amount of monetary loss.  Rather, the complaint alleges generally that Plaintiff "incurred special damages, including lost earnings from teaching and coaching and the expenditure of legal fees."  (Dkt. 7 at ¶ 221; *see also id*. at ¶ 151 (alleging generally that Plaintiff was "forced to incur thousands of dollars in legal fees")).

These allegations are insufficient to meet the pleading standard under New York law.  For example, a plaintiff's "reference to 'having to purchase facilities for his buildings

---

prima facie tort may not be invoked as a basis to sustain a pleading which otherwise fails to state a cause of action in conventional tort," but "where a traditional tort remedy exists, a party will not be foreclosed from pleading, as alternative relief, a cause of action for prima facie tort").  In other words, "a set of facts giving rise to a common-law tort is fatal to a prima facie tort claim . . . for once a traditional tort is established the cause of action for prima facie tort disappears," *see Chen*, 854 F.2d at 628, and "[c]ourts have dismissed prima facie tort claims that were duplicative of claims for discrimination and harassment," *see Hamilton v. Cnty. of Onondaga, N.Y.*, No. 5:15-cv-01333 (BKS/TWD), 2018 WL 4554496, at *20 (N.D.N.Y. Sept. 21, 2018); *see also Gallagher v. N.Y.C. Health & Hosps. Corp.*, No. 16 Civ. 4389 (GBD), 2017 WL 4326042, at *6 (S.D.N.Y. Sept. 20, 2017) (dismissing *prima facie* tort claim where plaintiff failed "to plead any facts to support a claim for prima facie tort," and instead reasserted "the same allegations of misconduct and general harm that form the basis of their other causes of action."), *aff'd*, 733 F. App'x 3 (2d Cir. 2018); *see also Forbes v. City of Rochester*, No. 6:18-CV-06700 EAW, ___ F. Supp. 3d ___, 2020 WL 1963139, at *8 (W.D.N.Y. Apr. 6, 2020) ("having plausibly alleged common-law tort claims, Plaintiff's prima facie tort claim necessarily fails").  Because the claim is dismissed for other reasons, the Court does not reach the issue of whether the prima facie tort claim could withstand dismissal on this ground.

and equipment off-site and to pay extensive legal fees . . . and filing fees' is not the itemization required to state a claim for prima facie tort" because these statements fail "to allege special damages with any particularity." *T.S. Haulers, Inc. v. Town of Riverhead*, 190 F. Supp. 2d 455, 466 (E.D.N.Y. 2002).  Likewise, an allegation that a plaintiff "is no longer employed as a deputy sheriff/corrections officer and she is divorced," and "has suffered financial loss due to unemployment," does not properly plead, with the required particularity, the existence of special damages, including because those allegations "fail to specify the alleged value of these injuries." *Doolittle v. Ruffo*, 882 F. Supp. 1247, 1259 (N.D.N.Y. 1994).  Here, Plaintiff does not even attempt to quantify the value of his injuries. *See also Harisch*, 2016 WL 1181711, at *13 ("Although the Amended Complaint does contain the conclusory allegation that defendants' prima facie tort 'caused Harisch specific and quantifiable monetary loss,' there is no attempt to state this loss generally, much less with the particularity New York law requires."); *Fordham v. Islip Union Free Sch. Dist.*, 662 F. Supp. 2d 261, 277 (E.D.N.Y. 2009) (dismissing *prima facie* tort claim where complaint failed to allege special damages, explaining that "special damages must be alleged with sufficient particularity to identify actual losses and round sums without any attempt at itemization are insufficient" (quoting *Discover Grp. v. Lexmark Int'l, Inc.,* 333 F. Supp. 2d 78, 87 (E.D.N.Y. 2004)); *Bradley v. Nat'l R.R. Passenger Corp.*, 797 F. Supp. 286, 295 (S.D.N.Y. 1992) (explaining that "New York courts are clear that allegations of damages in round figures without any further explanation do not satisfy the requirement that special damages be pled with particularity," and dismissing *prima facie* tort claim, where "the complaint allege[d] only that 'plaintiff suffered damages in the amount of

- 56 -

$50,000, together with punitive damages in the amount of $500,000.'"). Accordingly, Plaintiff's *prima facie* tort claim is dismissed.

## **CONCLUSION**

For the foregoing reasons, the School District Defendants' motion for summary judgment is granted, and their motion to dismiss (Dkt. 9) is granted in part and denied in part, and the motion to dismiss filed by the Town Defendants (Dkt. 11) is granted in part and denied in part. The Clerk of Court is directed to terminate the Webster Police Department as a defendant to this action, and to correct the spelling of Chief Rieger's name on the docket, which is presently listed as "Joseph Reiger," so that it is listed as "Joseph Rieger."

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: March 17, 2022
Rochester, New York